**Joseph S. NEAL, Appellant,**

v.

**SECRETARY OF the NAVY AND COMMANDANT OF the MARINE CORPS, Appellees.**

No. 79–2174.

United States Court of Appeals, Third Circuit.

Argued June 12, 1980.

Decided Feb. 2, 1981.

---

James D. Crawford, Deena Jo Schneider (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Division, William J. McGettigan, Rachel Shao (argued), Asst. U. S. Attys., Philadelphia, Pa., for appellees; Matthew J. Gormley, III, Commander JAGC, Lieutenant T. Pierce Leary, U. S. Dept. of the Navy, Alexandria, Va., of counsel.

Before HUNTER, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

### ISSUES

Joseph Neal, appellant, a member of the United States Marine Corps for more than fourteen years, was denied permission to reenlist. The questions he has presented on appeal are: (1) Whether the actions taken by the Marine Corps and the Navy with respect to Neal's reenlistment request violated their statutory mandates and relevant military regulations and procedures; (2) Whether the administrative determination not to permit Neal to reenlist in the Marine Corps was arbitrary and capricious and without any substantial and reasoned basis in fact; and (3) Whether the procedures followed by the Marine Corps and the Navy violated Neal's due process rights.*

### II.

### FACTS

The facts in this case are fully described in the opinion of the district court, and therefore will be summarized only briefly here. *See Neal v. Secretary of the Navy*, 472 F.Supp. 763, 766–769 (E.D.Pa.1979). Neal originally enlisted in the Marine Corps on May 18, 1960; he reenlisted on Novem-

---

* The court expresses its appreciation to Deena Jo Schneider who was appointed counsel to represent appellant in this appeal. It is only through the generosity and commitment of such volunteer attorneys that appeals raising difficult legal issues can be effectively prepared for our consideration.

ber 18, 1964 and on October 24, 1970. He served on active duty including service in Cuba in the early 1960's and two tours of duty in Vietnam. He received numerous decorations for his actions and service in Vietnam,[1] and also received the Good Conduct Medal four times for conduct denoting "honesty and faithful service in keeping with the highest traditions of the Marine Corps."

In July 1973, he was promoted to the rank of gunnery sergeant, and in February 1974, he was appointed to recruiting duty, a selection which demonstrated confidence in his ability and performance.[2] In connection with his promotion, Neal was required to and did submit a request to reenlist a third time in May 1974. Neal's term of duty would have expired in October 1974, but was extended for two months to permit him to complete a training course at the Army Corps of Engineers joint services school.

Neal's request to reenlist for five years was referred to the Enlisted Performance Board ("EPB") on August 24, 1974. The EPB provides the Commandant of the Marine Corps with advice and recommendations on enlisted personnel matters which he can either approve or disapprove. The EPB which considered Neal's reenlistment was convened pursuant to the Precept for the Enlisted Performance Board then in effect, dated October 26, 1973, which provided that the EPB would consider and make recommendations on, *inter alia*, the reenlistment of Marines where the reenlistment would result in service beyond 20 or 30 years.[3]

The primary challenge which Neal presses in this lawsuit concerns the proceedings conducted by the EPB. Neal was informed, through a communication to his commanding officer, that the EPB was reviewing Neal's application for reenlistment, that a psychiatric evaluation was required, and that the EPB would consider two Naval Investigative Service ("NIS") reports dated September 18, 1972 and January 8, 1974. Neal was also informed that any written statement concerning these reports which he submitted before September 11, 1974 would be considered by the EPB in its review. However, neither Neal nor his commanding officer was permitted to see these reports nor were they able to obtain any additional information about them. Additionally, Neal was not advised to seek the assistance of counsel nor informed of the availability of counsel.

The two NIS reports concerned two incidents in which Neal was allegedly involved in homosexual behavior. Neal submitted a handwritten letter, dated September 5, 1974, setting forth his own version of the incidents which he correctly guessed were the subject of those reports. His letter contained his firm denial of any participation in homosexual acts and reflected his concern at being stigmatized as a homosexual. The EPB was also provided with a psychiatric evaluation of Neal, prepared for the purpose of evaluating his fitness to reenlist, which found him "[f]it for full duty [and] recommended for same."

In its consideration of Neal's reenlistment request, the EPB reviewed, *inter alia*, the

---

1. Among his awards are the Vietnam Service Medal with star, the Vietnam Cross of Gallantry with Palm and Frame, the Vietnam Campaign Medal with 60 device, the Armed Forces Expeditionary Medal, the Combat Action Ribbon, and the Presidential Unit Citation.

2. The letter notifying him of his selection, sent at the direction of the Commandant of the Marine Corps, stated in part:
   To have been selected for this duty is in itself evidence that your record is one of the Corps' finest. Your entire professional and personal record has been examined closely at this Headquarters to ensure that you have met the demanding criteria for the duty.

.　　.　　.　　.

[B]est wishes on your future assignment.

3. Marine Corps Order 1610.10 (June 20, 1978) has cancelled the Precept, dated October 26, 1973. Under this new Order, the Enlisted Performance Board "is empowered to review all Marine enlisted personnel records referred to it for the purpose of making recommendations concerning remedial promotion and substandard performance." The EPB no longer reviews cases where a Marine's reenlistment would extend service beyond 20 or 30 years. The same Order also revised the EPB's procedure. See pp. 1044–1045 *infra*.

1972 NIS report regarding an investigation of allegations that Neal had made homosexual advances towards another Marine while stationed in Okinawa, which investigation was dropped without the filing of any charges against Neal; the 1974 NIS Report which consisted of a police file showing the arrest of Neal by California police on charges of assault with a deadly weapon and sexual perversion, which charges were dismissed with prejudice when the alleged victim did not appear at trial; and other material which Neal was unaware would be considered, including a 1970 NIS Report regarding an interview of Neal concerning the suspected homosexuality of another Marine, references to a California police report that Neal had been contacted by the Oceanside Police Department on two occasions when he was drunk, which had been incorporated into the 1974 NIS Report, and the report of a March 1971 incident when Neal was disciplined after resisting apprehension by military police at Jacksonville, North Carolina. Neither Neal nor any other witnesses appeared before the EPB.

The EPB recognized that Neal's performance since 1970 had been "generally described as excellent," but recommended against Neal's reenlistment finding that his "personal conduct over the last five years had been prejudicial to the Marine Corps and not in keeping with the high standards expected of Marine [staff noncommissioned officers]." The one-page EPB opinion relied heavily on the three NIS reports. The EPB recommended that, based on "all the relevant facts", Neal be allowed no further service beyond his present term of service. The Commandant approved the EPB recommendation, and on November 20, 1974 Neal was informed of the denial of his reenlistment request but not of the reasons for the denial. On December 23, 1974 Neal was honorably discharged with a reenlistment code of RE–3C which bars reenlistment except by authorization of the Commandant.

Neal made efforts to learn the basis for the EPB decision since he was not furnished with a copy of its opinion. His counsel requested a copy of Neal's entire service record but was not supplied with the EPB opinion nor informed of its existence. Neal received edited versions of the NIS reports in March 1976, at which time he first learned of the existence of the 1970 NIS Report. The deleted portion of the 1974 NIS Report regarding contact by the California police when Neal was allegedly drunk was not made available to him until January 24, 1978. It was not until October 21, 1976 that Neal received a copy of the EPB opinion.

On June 11, 1976, Neal petitioned the Board for the Correction of Naval Records ("BCNR") to correct his record and to alter his reenlistment code so as to enable him to reenlist.[4] Although the BCNR originally declined to exercise jurisdiction asserting that it lacked the authority to review or to change reenlistment codes, the BCNR undertook such review after this suit was filed to compel it to consider Neal's case. In that connection a three judge panel of the BCNR examined documentary material including Neal's reenlistment application, his Marine Corps record, applicable statutes, regulations and policies and advisory opinions from, *inter alia*, the Marine Corps Personnel Management Division and the Marine Corps Judge Advocate Division.

On April 5, 1978 the BCNR informed Neal that the majority of the panel members had determined that "the evidence submitted was insufficient to establish probable material error or injustice," and that his application for relief was denied in all respects. The BCNR stated that it was proper for the reenlistment to be denied on the basis of the EPB finding that Neal's "overall record cast doubt on [his] eligibility for continued service, based on the implied risk

---

4. The BCNR is a civilian board which may recommend to the Secretary of the Navy, the correction of "any military record of that department when . . . necessary to correct error or remove an injustice." 10 U.S.C. § 1552(a) (1976); 32 C.F.R. § 723.2 (1979). The Marine Corps is within the Department of the Navy. 10 U.S.C. § 5011. *See also id.* § 5201(d) ("Under the direction of the Secretary of the Navy, the Commandant of the Marine Corps shall exercise supervision over . . . the Marine Corps . . .").

of continued involvement with military and civilian authorities and associated discredit to the Marine Corps."

The BCNR panel found that there was no right to appear before the EPB, to have adverse witnesses available for cross examination, or to have legal counsel assigned for the EPB hearing. It concluded that there was "insufficient evidence to show that [Neal] suffered any substantial prejudice as a result of the fact that [he was] not shown the Naval Investigative Service (NIS) reports prior to their consideration by the [EPB]," since Neal had not demonstrated that the EPB was under the mistaken impression that Neal had been convicted of any misconduct. Instead the panel found that the EPB considered the reports "in the context of investigative status only, and ... recorded that status in terms such as ... 'allegedly' and 'charges never materialized'." Moreover, "the [EPB's] recommendation and the subsequent decision of the Commandant were not punitive in nature, and resulted in a fully honorable separation." Finally, the panel found that Neal had been aware of the general subject of two NIS investigations and his statement had addressed the principal allegations of those investigations.

The third member of the BCNR panel dissented on the ground that the EPB proceedings were infected by a procedural error. The dissenting member believed "that the NIS reports considered by the Enlisted Performance Board contained adverse comments which clearly contributed to the recommendation of that Board that [Neal] be denied the opportunity to reenlist; and that it was procedurally improper for the Enlisted Performance Board to have considered said reports without having first given [Neal] an opportunity to examine them and to comment on their content." The dissent would have given Neal relief by convening another EPB to determine whether Neal should be permitted to reenlist and would have permitted Neal to appear before such a Board with counsel. If, thereafter, reenlistment were recommended, the dissent thought backdating of the reenlistment should be considered. Since the majority did not find error or injustice and determined that the application should be denied without a hearing,[5] the application was denied.

Neal's Complaint in this case was amended to take account of the changed posture of the case after the BCNR review. It attacked the procedures followed by both the BCNR and the EPB as being violative of prescribed regulations and his constitutional rights. Neal requested that the Marine Corps be ordered to correct his records and that he be permitted to reenlist with backpay.

The district court determined that it had subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over the equitable claims asserted by Neal, a decision defendants do not challenge on appeal.[6] The court rejected defendants' claim that there could be no judicial review of military affairs, and undertook to determine whether the procedures followed in Neal's case complied with the applicable statutes, regulations, and procedures, and whether they were arbitrary and capricious. After finding that the relevant procedures were followed, and that the actions had been neither arbitrary nor capricious, the court turned to Neal's constitutional due process claims. The court held that the denial of the reenlistment application implicated no property or liberty interest and therefore did not have to comport with the mandates of the due process clause. There being no genuine issue of material fact, summary judgment was granted in favor of the defendants.

---

5. The District Court found Neal did not request a hearing before the BCNR. 472 F.Supp. at 768 n. 9. Neal claims his declination of a hearing was conditional on the Board's acceptance of his version of the facts.

6. The court did find, however, that Neal's claim for backpay was within the exclusive jurisdiction of the Court of Claims pursuant to the Tucker Act, 28 U.S.C. § 1346(a)(2) (Supp. III 1979) and the jurisdictional statute for the Court of Claims, id. § 1491, since the claim exceeded $10,000. 472 F.Supp. at 774.

### III.

### MANDATED REGULATIONS AND PROCEDURES

We turn first to Neal's claim that the EPB and BCNR proceedings did not follow the prescribed statutes, regulations and procedures. Even in the absence of an obligation to enact regulations and guidelines, an agency is bound to follow those which it has adopted. *See Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1168, 1 L.Ed.2d 1403 (1957). Neal attacks the EPB as having been without authority in his case because it was convened pursuant to its authority to review requests for reenlistment beyond 20 or 30 years. Neal would have served 14 years 7 months and 6 days at the end of his then current term of duty. He claims approval of his requested reenlistment for five years would not have extended his service in the Marine Corps beyond 20 years. However, by statute the years of service of a member of the armed forces are, for many purposes including computation of retired pay, calculated by including a part of a year exceeding six months as a whole year. 10 U.S.C. § 1405 (1976). Thus Neal's service, if reenlistment had been permitted, would have been the equivalent of 20 years.[7]

Neal also claims a number of procedural irregularities, such as failure of the Head of the Enlisted Assignment Branch, who was present, to serve as the senior member of the Board; failure of the EPB opinion[8] to be signed by all the acting members; and its failure to state that its "recommendations represent the opinion of a majority." He also contends the EPB which sat in his case was improperly consti-

tuted because, under the Precept, members were to be chosen from specified departments and divisions, but a member of his EPB was from the Military Procurement Branch which is not included on the permissible list. It appears that this point was not raised below, where the court might have been able to ascertain whether the Military Procurement Branch is part of the Installation and Logistics Department, which is on the list. We see no reason to depart from our practice that precludes consideration of issues raised for the first time on appeal. *See Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 932–33 (3d Cir. 1976). Neal has failed to demonstrate prejudice resulting from the alleged departure from the procedural requirements on the remaining items. Since we view these as technical, rather than substantive requirements, and many of them, such as the requirement of signatures, appear to have been substantially complied with, we believe the case is distinguishable from those where the courts relieved plaintiff of showing prejudice. *See, e. g., Doyle v. United States,* 599 F.2d 984, 993–94 (Ct.Cl.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980); *Ricker v. United States,* 396 F.2d 454, 456–57 (Ct.Cl.1968); *Henderson v. United States,* 175 Ct.Cl. 690, 699 (1966), *cert. denied,* 386 U.S. 1016, 87 S.Ct. 1373, 18 L.Ed.2d 455 (1967).

Neal includes as a claim of procedural irregularity an attack on the nature of the evidence considered by the EPB and BCNR and the standards applied by these Boards. We will treat that claim as related to the substance of the determination, an issue we consider in Section IV. We conclude, as did the district court, that Neal's claim that the Marine Corps failed to comply with all rele-

---

7. Twenty years of service is significant since a person who serves in the armed forces for that period of time is eligible for military retirement benefits. *See, e. g.,* 10 U.S.C. § 1293 (1976) (warrant officers). Neal suggests that the service time should be computed without counting the two months extension he was granted to attend school, because that extension occurred after his case was referred to the EPB. We believe the relevant service time can be computed as of the time the EPB considered Neal's claim.

8. The decision of the EPB is recorded in a document termed throughout the proceedings as a "transcript." Since it is not in fact a verbatim transcript of proceedings, as the word is customarily used in judicial proceedings, and consists merely of one page in which the substance of the reenlistment request is discussed and the decision recorded, we are terming the document an opinion.

vant statutes, regulations and procedures must fail.

## IV.

### ADMINISTRATIVE DETERMINATIONS

The district court considered and rejected Neal's claim that the decision refusing him reenlistment was so arbitrary and capricious as to constitute an abuse of discretion. Defendants, while supporting the district court's finding that the refusal was not improper, nevertheless deny judicial power to review military decisionmaking under this standard. They contend that the Administrative Procedure Act, which calls for review to determine if the agency action was arbitrary and capricious, 5 U.S.C. §§ 702, 706 (1976), is inapplicable here. Instead, defendants claim that under the decision in *Harmon v. Brucker*, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), the only basis for review is whether the Marine Corps has acted within its jurisdiction (scope of authority), consistent with the Constitution and applicable statutes and regulations.

Essentially, defendants rely on the sovereign immunity doctrine to support their claim that review is precluded. Defendants, however, fail to meet this court's opinion in *Jaffee v. United States*, 592 F.2d 712 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) (*Jaffee I*). Yet it was that case on which the district court relied in holding that judicial review is available not only to determine if a military official has acted unconstitutionally, outside the scope of his or her powers, or in violation of regulations, but also to determine if an action was arbitrary, capricious or an unlawful exercise of discretion. In *Jaffee I*, suit was filed against the United States (including military departments and officials) seeking, *inter alia*, equitable relief on a claim arising out of actions by the Department of the Army. We held there that the APA, which provides in part that

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled

to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted ... in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States. . . .

5 U.S.C. § 702 (1976), waives sovereign immunity for equitable actions brought pursuant to 28 U.S.C. § 1331. *Accord, Beller v. Middendorf*, 632 F.2d 788 (9th Cir. 1980).

We further held that the United States Army is an "agency" within the meaning of the APA, since "agency" is defined to include "each authority of the Government", 5 U.S.C. § 701(b)(1) (1976), and the only exceptions applicable to the military are those for "military authority exercised in the field in time of war or in occupied territory," *id.* § 701(b)(1)(G), and "courts martial and military commissions," *id.* § 701(b)(1)(F), neither of which is applicable here.

*Harmon v. Brucker, supra*, does not compel a different result. In that per curiam decision, the Court in fact reviewed the decision of the Army Discharge Review Board, and held that discharge on the basis of petitioners' pre-induction activities exceeded the Secretary of the Army's statutory authority. The Court's assumption of jurisdiction was made over a vigorous dissent by Justice Clark that the judiciary had never before interfered with military discharges, thus giving further support to our view that the Court's assumption of jurisdiction was purposeful and far-reaching. There is no language in the opinion to support defendants' view that the Court therein limited judicial review of military decisionmaking to preclude examination of actions by military boards under the arbitrary and capricious standard. Furthermore, last term the Supreme Court stated in *Secretary of the Navy v. Huff*, 444 U.S. 453, 457 n.5, 100 S.Ct. 606, 608 n.5, 62 L.Ed.2d 607 (1980), "the federal courts are open to assure that, in applying [military] regulations, commanders do not abuse the discretion necessarily vested in them."

Inexplicably, the government's brief totally ignores the substantial authority relied on by plaintiff to support the authority of the judiciary to review the actions of military boards under an arbitrary and capricious standard. In *Sanders v. United States*, 594 F.2d 804 (Ct.Cl.1979), the Court of Claims noted that the defendant there, as do defendants here, entangled the concepts of jurisdiction to review with the scope of judicial review. *Id.* at 809. There the court, which had been requested to review the action of the Air Force Board for Correction of Military Records, commented with surprise at the approach taken by the government in challenging the court's jurisdiction to review the Board's actions because "we have reviewed these board actions with great frequency since 1951 when the present correction board statute became law, explicitly authorizing the payment of claims consequent upon the correction of military records." *Id.* at 811. The court continued:

> Congress has acted by providing servicemen with an administrative remedy for their wrongs. Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal *because it was arbitrary, or capricious*, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due. *See, e. g., Skinner v. United States*, [594 F.2d 824 (Ct.Cl.1979)]; *Boyd v. United States*, 207 Ct.Cl. 1 (1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1006, 47 L.Ed.2d 314 (1976); *Cooper v. United States*, 203 Ct.Cl. 300, 304 (1973).

*Id.* (emphasis added). The court also noted that its decision as to the availability of judicial review was reinforced by the APA which embodies the basic presumptions of judicial review to one adversely affected by agency action. *Id.* at 812.

This court had occasion to assert the power of the judiciary to review the decisions of the BCNR in *Nelson v. Miller*, 373 F.2d 474 (3d Cir.), *cert. denied*, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967). In that case, we affirmed the denial of a preliminary injunction to restrain the Navy from discharging petitioner, but expressly held that the courts have jurisdiction to take such protective action in an appropriate case. *Id.* at 479. We also upheld the district court's action in retaining jurisdiction of the case for adjudication after conclusion of the BCNR proceeding.

■ Many of the cases involving a challenge to the action of military boards have arisen in the Court of Claims which has exclusive jurisdiction of all contract actions against the United States where the amount in controversy exceeds $10,000. 28 U.S.C. §§ 1346(a)(2), 1491 (Supp. III 1979). As demonstrated by the *Sanders* opinion, that court has not hesitated to review the actions of those boards under an arbitrary and capricious standard. *See, e. g., Skinner v. United States*, 594 F.2d 824 (Ct.Cl.1979); *Yee v. United States*, 512 F.2d 1383 (Ct.Cl. 1975); *Skaradowski v. United States*, 471 F.2d 627 (Ct.Cl.1973). Similarly the Court of Appeals for the District of Columbia, in *Matlovich v. Secretary of the Air Force*, 591 F.2d 852 (D.C.Cir.1978), declared its power to determine whether the action of the Air Force Correction Board in refusing to overturn the discharge of an admittedly homosexual officer constituted an abuse of discretion. We agree with the district court in this case that we have both the power and the duty to review the actions of the EPB and the BCNR to ascertain whether there is any basis for plaintiff's claim that those agencies acted in an arbitrary and capricious manner.

■ Turning then to the question whether the administrative decision not to permit Neal to reenlist was arbitrary and capricious, we agree with the district court that "there is a strong presumption that the personnel involved in the decisionmaking process have faithfully discharged their duties...." 472 F.Supp. at 776. Such deference applies not only to the military but

to any decisionmaker whose decision is to be reviewed under a standard that assumes discretion has been exercised soundly, in the absence of proof to the contrary. That is the basis for selection of an arbitrary and capricious standard rather than one providing less restrictive review.

Plaintiff's attack on the agency determination in this case is multifaceted. He claims that the EPB's decision to recommend against permitting him to reenlist was made on the basis of allegations dismissed as unprovable; that the allegations which formed the chief basis for the decision were kept secret from him; that he received no timely explanation for the denial of his reenlistment request; that even when such explanation was made available, it did not articulate the reasoning behind the determination with the required specificity; and that the BCNR proceeding was similarly deficient in failing to provide plaintiff with a timely copy of the EPB's transcript or to explicate its decision that the EPB violated none of Neal's procedural rights.

■ There are two threads that run through plaintiff's claims which plaintiff has failed to separate and which merit different treatment. Plaintiff appears to be complaining first, as to the procedure followed by the two boards, and second, as to the probative value of the evidence relied upon by the EPB. With respect to the procedure followed, it is necessary to examine whether the procedure was in accord with the applicable statutory and administrative regulations, and whether it was constitutionally deficient. As we have previously noted, the district court examined the applicable regulations and procedures and found that the proceedings were conducted in conformity with them. It also found that the explanation of the basis for the EPB's decision followed the standards set forth in the Marine Corps Separation and Retirement Manual, and that the BCNR similarly furnished an adequate explanation

of the basis for its refusal to correct Neal's record. In reviewing this record, we cannot say that the district court erred in its decision in this regard. Although neither administrative opinion provides an extensive exegesis of the underlying reasoning, each provides a sufficient explanation of the basis upon which each agency acted.

Plaintiff's attack on the probative value of the evidence is more troublesome, because the evidence consists primarily of allegations and charges which never culminated in any decision adverse to plaintiff on the merits. Plaintiff claims that the NIS reports considered in his case include both hearsay testimony and malicious gossip, and that the small number of incidents involved, only one of which was pursued or even arguably serious, do not form a reliable basis for the finding that they demonstrate an "implied risk of continued involvement" as found by the EPB.

The only regulation to which plaintiff points which relates to the evidence to be considered is that contained in paragraph 6002.3 of the Marine Corps Separation and Retirement Manual which provides that acquittals or charges which have been preferred and dropped will not *ordinarily* be considered in determining whether the Marine should be administratively separated.[9] This provision is not dispositive since it does not totally preclude consideration of such charges. Moreover, paragraph 6002.3 specifically refers to paragraph 6005.5b which permits an undesirable discharge to be based on acquittals or equivalent dispositions based on legal technicalities not going to the merits of a case. Such technicalities are defined to include withdrawal of charges or nolle prosequi before jeopardy attaches and failure of the charges to allege an offense.

It is significant that plaintiff does not claim that the Marine Corps cannot constitutionally consider alleged homosexuality or that a decision refusing reenlistment on that basis is constitutionally defective, and

**9.** "Administrative separation" is defined in regulations virtually identical to those in the Manual to include separation from the military by

reason of the expiration of an enlistment. 32 C.F.R. §§ 730.50(e)(4), .51(c), .54(e)(2) (1979).

therefore we do not reach that issue. *Compare Beller v. Middendorf, supra; Matlovich v. Secretary of the Air Force, supra*; and *benShalom v. Secretary of the Army,* 489 F.Supp. 964 (E.D.Wis.1980). We are merely asked to hold that the EPB's reliance on the evidence before it to support its decision was arbitrary and capricious. We cannot so find on this record.

■ Although there may be valid arguments to the contrary, it simply is not the law that only charges culminating in an adverse decision on the merits have probative value. For purposes of sentencing, which has far graver consequences than retention in employment, pending indictments for other criminal activity are of sufficient reliability to warrant their consideration by a sentencing judge. *United States v. Metz,* 470 F.2d 1140 (3d Cir. 1972), *cert. denied sub nom., Davenport v. United States,* 411 U.S. 919, 93 S.Ct. 1558, 36 L.Ed.2d 311 (1973). *See also United States v. Majors,* 490 F.2d 1321 (10th Cir. 1974), *cert. denied,* 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975) (indictment dismissed pursuant to plea bargain can be considered in sentencing); *State v. Montoya,* 91 N.M. 425, 575 F.2d 609, *cert. denied,* 91 N.M. 491, 576 P.2d 297 (1978) (arrests). Even more directly relevant are cases holding that adverse administrative personnel actions can be based on evidence of misconduct, even when the employee was acquitted in criminal proceedings of charges based on such evidence. *Alsbury v. United States Postal Service,* 530 F.2d 852 (9th Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976); *Polcover v. Secretary of Treasury,* 477 F.2d 1223, 1231–32 (D.C.Cir.), *cert. denied,* 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). *Cf. Robinson v. Resor,* 469 F.2d 944, 950 (D.C.Cir.1972) (court will not uphold decision of correction board based on charges against plaintiff which are wholly unsupported by the record). The difference in the nature of the proceedings was explained in *Finfer v. Caplin,* 344 F.2d 38, 41 (2d Cir.), *cert. denied,* 382 U.S. 883, 86 S.Ct. 177, 15 L.Ed.2d 124 (1965), where the court stated, "[t]he law does not require that the proof which might lead to an administrative determination that removal would be for the best interests of the IRS be of the same quality as would be necessary to convince a jury beyond a reasonable doubt to convict in a criminal case."

Because plaintiff has pressed the point that the EPB's reliance on the evidence in the NIS reports was arbitrary and capricious, we are constrained to comment upon the two incidents reflected there. The 1974 NIS Report contains the Oceanside Police Department file reports of Neal's arrest by Oceanside, California Police for assault with a deadly weapon, sodomy, and sexual perversion involving oral copulation; that he was held over for trial following a preliminary hearing; that the trial date was postponed; and that on March 25, 1974 all charges were dismissed due to the unavailability of the witness. The file includes the witness' statement, written in his own handwriting, which goes into great detail about his encounter with Neal. Neal's invitation that he accompany him home, and then the step by step events culminating in his allegation that Neal used threats, force and a knife to compel him to submit to unwelcome homosexual contact. The Report also contains a police officer's report as to the witness' oral recitation to him of the same facts on the day in question, and a report by another officer that a week later the witness repeated the same allegations. Several days later, the witness was interviewed by the Chief Deputy District Attorney who was convinced that some type of crime did take place. Thereafter, the witness picked Neal's photographs out of a mug file containing approximately seventy-five other photographs. In his written statement to the EPB, Neal admits the encounter with the witness, admits the witness accompanied him home, but denies any sexual contact.

The 1972 NIS Report concerns an investigation by the Naval Intelligence Service itself following a complaint that Neal had made unwelcome homosexual advances to another Marine in Okinawa. The Report includes the witness' signed statement relating his encounter with Neal, his accom-

panying Neal home, and being awakened by Neal's advances. Neal, in his written statement to the EPB, again admitted his encounter with the witness and his invitation to the witness to come home with him. He denied any sexual involvement, but the circumstances under which the witness was picked up by the military police could be considered to give credence to the witness' version of the facts.

In reviewing personnel decisions by the military, the courts do not sit as a supertribunal to substitute our decision on the evidence for that of the appropriate military board. We believe that, if there were no inherent defect to the procedures used, the files containing as they do sworn witnesses' statements present adequate evidence from which the EPB could have determined that Neal's conduct was "not in keeping with the high standards expected of Marine SNCO's," and that its decision in that regard was not arbitrary and capricious.

The district court's analysis of Neal's claim that the administrative decisions were arbitrary and capricious is confined to the two issues discussed above—compliance by both the EPB and the BCNR with the applicable regulations and standards and the probative nature of the evidence considered. Neal also contends that because the EPB's procedure failed to accord him an opportunity to comment on all of the material which formed the basis for its adverse decision, its determination was inherently unreliable, and the BCNR's failure to rectify this procedure on its review of the EPB's action must be characterized as arbitrary and capricious. The district court apparently assumed that Neal's complaint in this regard was relevant only to his claim that he was entitled to procedural due process.

Reaching the constitutional issue, the district court found that Neal had no liberty interest implicated because there was no evidence that defendants would make the reasons for Neal's denial of reenlistment public in derogation of their own regulations. 472 F.Supp. at 786.[10] It also found that Neal had no property interest deriving from any statute, Marine Corps regulation, or policy granting Neal the right to reenlist, and that the various factors on which Neal relied to claim an expectancy at most gave him a "subjective expectancy" that he would be permitted to reenlist which was "simply not protected by the due process clause." 472 F.Supp. at 784.[11] Accordingly,

---

**10.** The district court stated that although a "governmental attack on one's 'good name, reputation, honor or integrity' may be a deprivation of liberty within the meaning of the ... due process clause[ ]," the Marine Corps did not "brand [Neal] guilty of substandard conduct." 472 F.Supp. at 785. The court also found that neither the community nor prospective employers would know from public records the reasons for Neal's denial of reenlistment. Neal does not contest the district court's interpretation of the operation of the applicable Marine Corps procedures regarding confidentiality of the proceedings. Instead he has argued that his standing and reputation may have been affected by knowledge gleaned or available as a result of his efforts, presumably including this litigation, to have the records corrected. Apparently he contends that these subsequent developments can be used to create a retroactive liberty interest applicable to the original proceedings. *But see Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

**11.** The statute governing reenlistment provides that "[a] person discharged from a Regular component may be reenlisted in the ... Regular Marine Corps ... under such regulations as the Secretary concerned may prescribe." 10 U.S.C. § 508(b) (1976). *See In re Richardson*, 209 Ct.Cl. 754, 758 (1976) ("no service member has any statutory right to reenlist" since section 508(b) is "clearly permissive"). Neal has not directed us to any Marine Corps regulation or policy which specifically grants a Marine the right to reenlist. Neal seeks to place himself within the entitlement or expectation theory embraced in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) and their progeny. *See, e. g., Hennessey v. National Collegiate Athletic Ass'n*, 564 F.2d 1136, 1146 (5th Cir. 1977); *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 367 (9th Cir. 1976). He bases his claim on his averments that he was continually encouraged and counseled to consider the Marine Corps as a career offering financial and job security; that he was treated and addressed as a "lifer" and as if "it was expected that he would remain in the Marine Corps until retirement"; and that his excellent record, numerous decorations, and outstanding evaluations all

the court held there was no requirement of procedural due process.

If we agreed that Neal's attack on the procedure followed in his case could be considered only as a constitutional challenge, we would be obliged to analyze whether there was a plausible basis on which to find the type of interest which triggers the requirement for some procedural safeguards.[12]

Neal, however, has not limited his claim to a constitutional one, but has made essentially the same argument as a statutory claim as well. Since we believe there is an adequate basis to accept Neal's contention that in this case, under this statute, the

---

contributed to his reasonable understanding that he would be permitted to serve in the Marines, either in active duty or in the Fleet Reserve for at least twenty years. Furthermore, he argues that his claimed right to reenlist is supported by his selection for recruiting duty for a period that would have exceeded the remainder of his term, which required him to agree to extend his reenlistment or to reenlist for a period of two years in connection with his promotion to the rank of gunnery sergeant; that he was again called a "career Marine"; and that he was assured, while attending the Army Corps of Engineer joint services school, that he would be permitted to reenlist because it would make no sense to send him to the school if he was going to be discharged.

Since our disposition of the case does not require us to meet the issue, we note merely that Neal points to no provision signed on behalf of the Marine Corps which imposes on it the reciprocal obligation to accept his application for reenlistment and that the statements allegedly made which contributed to his understanding have not been shown by Neal to be authorized representations on behalf of the Marine Corps that he would be granted reenlistment which would, at a minimum, be required before the encouragement to Neal to become a career Marine could be considered equivalent to the "common law" of tenure considered in *Perry v. Sindermann, supra.*

12. It is arguable that the congressional establishment of a system of review first by the BCNR and then by the courts creates an expectation of regularity sufficient to trigger the need for some procedural due process. A system of review is designed both to provide a substantive check on the underlying action and to give the appearance of legitimacy and fairness to the entire scheme by demonstrating that the underlying action is sustainable by neutral and objective reviewers. Hence, the expectation such a system creates might require that the procedures followed in the course of that review conform, at the least, to those we have traditionally equated with fundamental fairness. Such a result might follow from the series of cases holding that both property and liberty interests can be created by statutory entitlements. For property interest cases, *see, e. g., Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (establishment of a welfare benefit pro-

gram gave rise to the requisite entitlement on behalf of those who met the statutory qualifications); *Goss v. Lopez,* 419 U.S. 565, 573–74, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975) (state system of public education which permitted suspension only on grounds of misconduct created a legitimate claim of entitlement to attend the public schools); *Mackey v. Montrym,* 443 U.S. 1, 10 n.7, 99 S.Ct. 2612, 2617 n.7, 61 L.Ed.2d 321 (1979) (right to retain one's driver's license absent statutorily defined cause for suspension implicates a protectible property interest). For liberty interest cases, *see, e. g., Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) (a statute granting good time credit to prisoners for time served absent serious misbehavior created a protectible interest); *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 96 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (parole); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (probation revocation); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation); *Vitek v. Jones,* 445 U.S. 480, 489–90, 100 S.Ct. 1254, 1260–61, 63 L.Ed.2d 552 (1980) (protectible liberty interest created by a statute interpreted to provide that a prisoner could be transferred to a mental institution only if it was determined that he suffered from a mental disease or defect); *Winsett v. McGinnis,* 617 F.2d 996, 1006–07 (3d Cir. 1980), *cert. denied,* (1981) (en banc) (statutorily created work release program with regulations governing eligibility created the requisite entitlement imposing an obligation that the procedures conform to due process standards). The rationale behind these decisions is that the action by the legislature in replacing the decisionmaker's prerogative to be arbitrary with a more orderly, equitable, and credible system imposes an obligation that such a system deliver what it promises. Similarly, the establishment of review procedures can be considered as encompassing a congressional intention that the proceedings of these tribunals be accompanied by features of fundamental fairness. Otherwise, the establishment of a system of review tribunals would provide merely an illusion of judiciousness and accountability. Our disposition of this case on statutory grounds makes it unnecessary for us to deal with this provocative issue.

BCNR failed to follow the statutory directive, we need not reach Neal's constitutional claim.

After rejecting Neal's claims, the district court commented:

> While we are constrained to hold that the defendants' actions in the instant case are statutorily and constitutionally permissible, we are of the view that procedures enabling a person in Neal's position to examine *all* materials in his record before his case is submitted to the EPB, or even to appear before that Board where, as here, serious but unproven accusations are contained in his record, *would more closely comport with traditional notions of fairness*, and yet would not be unduly burdensome for the Marine Corps.

472 F.Supp. at 787 n.39 (emphasis of "all" in original, remainder added). The district court apparently assumed that an administrative agency has no obligation to afford any procedural rights in the absence of a specific statutory or regulatory mandate or a constitutional imperative. Such a restrictive view does not comport with the available precedents and is inconsistent with the language and history of the statute establishing the BCNR.

Ordinarily, the procedural requirements which an agency must follow are those set by its governing statute or regulations. However, as the Supreme Court recognized in a different context, "[t]his is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). Courts have undertaken to consider the procedure followed by the agency when the procedural defects allegedly rise to the level where they may affect the integrity of the agency's factfinding and decisionmaking. *See, e. g., East Texas Motor Freight Lines, Inc. v. United States*, 593 F.2d 691, 694 (5th Cir. 1979); *Kotakis v. Elgin, Joliet & Eastern Railway Co.*, 520 F.2d 570, 575 (7th Cir.), *cert. denied*, 423 U.S. 1016, 96 S.Ct.

451, 46 L.Ed.2d 389 (1975); *S.D. Warren Co. v. NLRB*, 342 F.2d 814, 816 (1st Cir. 1965) (refusal to consider evidence presented is arbitrary); *United Transportation Union v. Washington Terminal Co.*, 86 CCH Lab. Cas ¶ 11,508 (D.D.C.1979) (decision of National Railroad Adjustment Board may be reviewed where claimant has been denied opportunity to rebut or present evidence crucial to his claim); *McDonald v. Penn Central Transportation Co.*, 337 F.Supp. 803, 806–07 (D.Mass.1972).

■ The statute establishing military review tribunals explicitly obliges them to act to "remove an injustice," 10 U.S.C. § 1552(a) (1976), a task which necessarily entails an inquiry by the tribunal as to whether the individual has been treated in a manner comporting with traditional notions of fairness. In essence, the military correction boards were established to provide an institutional check on arbitrary action. Before the legislation which authorized creation of administrative boards, Congress itself reviewed military discharges on an ad hoc basis. When Congress determined to change the previously prevailing system, it did so by providing for tribunals with broad, not restricted, review power. It need not have done so. It could have, without any constitutional impediment, maintained or perpetuated the practice by which military personnel decisions were the sole prerogative of the commanding officers. Instead, when Congress established civilian boards to review military personnel decisions, it did not provide for boards limited, as the names may erroneously imply, to the clerical function of making technical correction of records of military personnel. On the contrary, the statute provides in part:

> (a) The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error *or remove an injustice*.

10 U.S.C. § 1552(a) (1976) (emphasis added).[13]

In *Sanders v. United States, supra*, 594 F.2d at 812, the court said:

Congress conferred broad powers on the Secretaries to remedy errors and injustices. Congress, in so doing, voluntarily and explicitly relinquished its authority in this area and terminated servicemen's access to Congress for correction of military records by way of private bill. 2 U.S.C. § 190g. The conjunction of these statutes implies that the Secretaries have a duty as well as the power to afford servicemen proper relief.

In *Skinner v. United States, supra*, 594 F.2d at 828, the same court, in discussing the refusal of the Correction Board to exercise its authority to order that certain illegal reports be removed from the officer's file, said: "[W]e do think this was the kind of error and injustice that cried aloud for relief and that Congress had in mind when creating correction boards. *Otherwise, the integrity of the promotion system is seriously compromised*" (emphasis added).

The relationship between the merits of a decision and the procedure by which it was reached is well recognized. Neal was deprived of the opportunity to know the precise matters which were being considered in connection with his request for reenlistment. He did not know the complete contents of the NIS Reports; he did not know that certain incidents were included; he did not know the details of the matters which he must rebut. Although he was told that two NIS Reports would be considered, he was required to stab in the dark as to the contents of those Reports. While he guessed correctly as to the nature of two of the incidents included in those Reports, he could not be expected to meet each detail, and of course, could not make any response about the incidents, such as drunkenness or mere questioning in an investigation of another Marine, which he was unaware were included.

We need not detail the importance of the opportunity to be apprised of the precise evidence which will be considered, so that an intelligent comment or response can be prepared. For example, the failure to provide even a summary of the evidence considered could result in the EPB's reliance on charges or allegations which related to someone other than the Marine under review if there had been a clerical mistake or mistake in identity. The EPB procedures also provided no opportunity to explain or rebut evidence which might on its face appear damaging but for which there might be a plausible excuse or explanation. Unless the BCNR grants an oral hearing, the procedures do not even appear to require that the evidence and EPB opinion be provided to the Marine before the BCNR proceedings so that an effective challenge could be mounted at the time of BCNR consideration. We can envisage no right more fundamental, and no procedure more lacking in fairness. As Justice Frankfurter wrote, "[t]he validity and moral authority of a conclusion largely depend on the mode

---

**13.** Regulations of the Department of the Navy provide the procedures to be followed by the BCNR. Upon proper application, the Board must decide whether to hold a hearing, recommend correction of the records without a hearing, or deny the application without a hearing. Any application may be denied if the Board "determines that insufficient relevant evidence has been presented to demonstrate the existence of probable material error or injustice." 32 C.F.R. § 723.3(e)(2) (1979). If during its review of a case the Board determines that "the facts have not been fully and fairly disclosed by the records or by the testimony and other evidence before the Board," the Board may obtain "such further information as it may consider essential to a complete and impartial determination of the facts and issues." *Id.* § 723.-6(a)(2). When an application is denied without a hearing the Board is required to issue a written opinion explaining the reasons for the denial along with all essential facts upon which the denial was based. *Id.* § 723.3(e).

Although the decision of the BCNR is in the form of a recommendation to the Secretary of the Navy who "will direct such action in each case as he determines to be appropriate." 32 C.F.R. § 723.7 (1979), he may not arbitrarily overrule the recommendations of the Board where its findings are justified by the record. *Nelson v. Miller*, 373 F.2d 474, 478 (3d Cir.), *cert. denied*, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967).

by which it was reached." *Joint Anti-Facist Refugee Committee v. McGrath,* 341 U.S. 123, 171, 71 S.Ct. 624, 648, 95 L.Ed. 817 (1951) (concurring). At another point in the same decision he wrote: "The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Id.* at 170, 71 S.Ct. at 647. Although the statutory language and hence our review is framed in terms of "injustice" rather than due process, the need for accuracy in the development of facts is equally applicable. *Mackey v. Montrym,* 443 U.S. 1, 13, 99 S.Ct. 2612, 2619, 61 L.Ed.2d 321 (1979). *See also Fuentes v. Shevin,* 407 U.S. 67, 97, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972).

■ Therefore we believe that the BCNR, having undertaken to review Neal's denial of reenlistment by the EPB, erred in fulfilling its statutory obligation to "correct an injustice" when it failed to recognize that the procedures followed by the EPB were so inherently unfair as to taint the merits of its decision. We cannot accept the conclusion of the two-person majority of the BCNR that Neal failed to show substantial prejudice as a result of this deprivation because the EPB was not under the mistaken impression that Neal had been convicted of any misconduct. It is manifest from reading the EPB opinion, portions of which are reproduced in the margin,[14] that it relied on the cumulative evidence of five incidents to reach its conclusion that "Neal's personal conduct over the last five years has been prejudicial to the Marine Corps and not in keeping with the high standards expected of Marine SNCO's." The fact that Neal guessed correctly as to the principal two incidents which were considered does not diminish the importance of the deprivation he experienced in not knowing that three other incidents were considered. We agree with the dissenting BCNR member that each of the incidents contributed to the EPB's recommendation. Therefore, we agree with Neal that it was arbitrary and capricious for the BCNR not to have held that the procedure the EPB followed in considering Neal's case failed to comport with traditional notions of fairness.

In this connection, we note with considerable interest that the Marine Corps, on its own initiative, has changed its procedures to preclude the recurrence of the claims of unfair treatment in this case. Under the present procedures of the EPB, which no longer routinely hears cases involving reenlistment requests extending over 20 years, when a case is referred to the EPB for substandard review in conjunction with, for example, a Marine's reenlistment request, the Marine will be provided with "a brief summary of the suspected substandard performance which forms the basis for the review as well as a copy of all evidence to be considered by the [EPB] in its review." Marine Corps Order 1610.10, Procedures for the Enlisted Performance Board (dated June 20, 1978) § 1(c)(3). The Marine will be permitted to submit a statement to the EPB after consultation with legal counsel.

---

14. The EPB opinion states, in part:

[Neal's] record also reveals that on three occasions he has either been linked with homosexual activities or allegedly actively engaged in the same. Files at NISHQ reveal that GySgt NEAL was interviewed in 1970 at Camp Lejeune, N.C. concerning his knowledge of suspected homosexual activity on the part of another Marine. [The opinion then refers to the 1972 and 1974 incidents to which Neal responded.] Further perusal of GySgt NEAL's record reveals that on 19 March 1971, he was awarded an Article 15 for violation of Article 95 UCMJ after resisting apprehension by Military Police at Jacksonville, N.C. NIS reports reflect that he had also been contacted by the Oceanside Police department on two separate occasions when he had been drunk.... In addition, GySgt NEAL prepared a statement for presentation before this Board which attempted to justify his actions, clear his name, and establish his manhood. *The Board, in considering all the relevant facts in his case, concluded that GySgt NEAL's personal conduct over the last five years had been prejudicial to the Marine Corps and not in keeping with the high standards expected of Marine SNCO's.* It is recommended that he be allowed no further service beyond his presently extended EAS. (emphasis added).

*Id.* at § 1(c)(4). Additionally, the commanding officer of the Marine concerned will submit comments and recommendations for the EPB's consideration. These comments are to be forwarded to the Marine who will then have the opportunity to submit a statement with legal counsel's aid, prior to the EPB's receipt of the comments. *Id.* at § 1(c)(5). It is likely that this litigation could have been avoided had similar procedural safeguards been provided at the time of Neal's hearing.

In view of the foregoing, we agree with the suggested remedy of the dissenting member of the BCNR, who recommended convening a new EPB for reconsideration of Neal's request for reenlistment. We recognize that there is no longer any EPB review for reenlistment under the 20 year provision, but an effective remedy in this case should attempt to put Neal into the position he would have been had the appropriate procedures been followed at the relevant time.[15] Neal has already been supplied with all the relevant evidence, but he should be given an opportunity to respond in accordance with the revised EPB procedures.[16]

In addition to his challenge to the absence of notice and effective opportunity to respond Neal contends he was entitled to an oral hearing and other attributes of procedural due process. The district court did not reach this issue. Obviously, there is a need for fact finding before administrative procedures which fail to require a hearing can be challenged under the statutory analysis undertaken here. Therefore, if Neal continues to press this point, it should be addressed in the first instance by the trial court.[17]

Accordingly, we will reverse the judgment of the district court and remand this case to it for the entry of an order in accordance with our opinion.

---

**15.** The guidelines which the EPB was to follow in reviewing requests for reenlistment which would result in service beyond 20 or 30 years were promulgated by the Marine Corps and provides:

> Noncommissioned officers, to be eligible for reenlistment, or extension of enlistment must have demonstrated the high standards of leadership, professional competence, and personal behavior required to maintain the dignity and authority of Marine Corps noncommissioned officers.

Marine Corps Manual § 1133(3)b.

**16.** Neal had the evidence by the time of BCNR review, but that Board did not undertake the de novo consideration requested by Neal. Therefore, the review by the BCNR did not effectively remedy the original procedural defects in the EPB proceeding. In view of our disposition, we need not decide whether Neal was entitled to de novo Board consideration.

**17.** In *Nelson v. Miller*, 373 F.2d 474 (3d Cir.), *cert. denied*, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967), we did not reach the issue of the due process rights before the BCNR, although the district court (Higginbotham, J.) had concluded that as a matter of law the discharged navyman was denied procedural due process in that he was denied an opportunity to cross examine the witnesses against him. *Id.* at 480–81 & n.26.