**Robert L. BOND, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 95–441C.**

United States Court of Federal Claims.

Sept. 12, 2000.

John A. Wickham, Evergreen, CO, attorney of record for the plaintiff.

Elizabeth G. Candler, Commercial Litigation Branch, James M. Kinsella, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., attorneys of record for the defendant.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

Plaintiff, Robert L. Bond, is a retired Lieutenant Colonel (LTC) from the United States Air Force Reserves. During December 1992, LTC Bond was assigned to the 434th Air Refueling Wing, Grissom Air Force Base, Indiana.

On or about February 22, 1992, LTC Bond had accrued 18 years of active duty service credited toward a 20 year active duty retirement. He was assigned to participating status in the Active Reserves. This status involves monthly drills and active duty for training (ADT). On or about December 9, 1992, LTC Bond received orders to complete a Single Integrated Operating Plan (SIOP) alert tour beginning December 20, 1992 and ending December 21, 1992. His orders classified the assignment as a "Special ADT" type tour. "Special ADT" type tours mandate that the participant be placed in a job with "primary training content" as part of the duty. LTC Bond's orders, however, did not place him in a job with primary training content.

On December 21, 1992, while serving on the second day of his two day ADT tour, LTC Bond submitted a written request to his commander, Colonel (COL) Batbie, to remain on active duty pursuant to the "sanctuary"

provisions of 10 U.S.C. § 1163(d) (1988).[1] These provisions allow certain reservists with 18 or more years of active duty service to remain on active duty until eligible for active duty retirement benefits. Attaining sanctuary status would enable a reservist to qualify for earlier and more substantial retirement benefits. For example, an active duty service member draws retired pay immediately upon retirement, whereas a reservist must wait until age 60 to draw retired pay.[2]

COL Batbie denied LTC Bond's request, noting that 10 U.S.C. § 1163(d) excludes ADT tours from its sanctuary provisions.[3] COL Batbie also pointed out that contrary to Air Force policy, LTC Bond had not sought prior approval from Headquarters, United States Air Force Reserve for a qualifying active duty for support (ADS) tour. Air Force policy restricts reservists near the sanctuary zone, i.e., those close to or with 18 or more years of active duty service, from receiving ADS[4] tours without prior approval.

LTC Bond contends that his orders erroneously classified what was actually an ADS tour as an ADT tour. Thus, he claims he was in the proper duty category to request sanctuary, despite what his orders read. Plaintiff alleges that with the exception of six officers near the sanctuary zone, all of the 100 officers who participated in the December 1992 SIOP alert tour were issued ADS orders. LTC Bond also asserts that there was no training component to the Single Integrated Operating Plan (SIOP) alert tour save for a cursory, after-the-fact training session that he was verbally, on the spot ordered to attend by COL Batbie immediately after his request for sanctuary was denied.

On or about July 9, 1993, LTC Bond applied for relief from the Air Force Board for Correction of Military Records (AFBCMR). On October 25, 1993, the Air Reserve Personnel Center legal office (ARPC/JA) issued an advisory opinion on LTC Bond's application. ARPC/JA's position was that for a reservist to fall within the 18 year sanctuary lock-in provisions of Section 1163(d), the reservist must be performing active duty other than for training when he or she satisfies the requirement of 18 active duty years toward a 20 year active duty retirement under 10 U.S.C. § 8911. ARPC/JA concluded that LTC Bond did not satisfy this requirement, because LTC Bond was on an ADT tour at the time of his application. ARPC/JA added that if the AFBCMR disagreed with its recommendations that LTC Bond's reserve orders should be amended to place him on ADS, that he should be returned to active duty to permit him to attain 20 active duty years under 10 U.S.C. § 8911, and that LTC Bond should be paid for all active duty entitlements. On January 11, 1994, LTC Bond, through counsel, responded to the ARPC/JA advisory opinion, contending that the ADT tour to which he was assigned on December 20–21, 1992 should have been designated as an ADS tour.

On April 12, 1994, the General Law Division at Headquarters, United States Air Force (JAG) issued an advisory opinion regarding LTC Bond's application. JAG concurred with the conclusions of ARPC/JA, asserting that a commander has the discretion to characterize duty as ADT or ADS. On June 14, 1994, LTC Bond, through counsel, responded to the JAG advisory opinion, again contending that the tour to which he had been assigned on December 20–21, 1992 was misclassified as ADT rather than ADS.

The AFBCMR denied LTC Bond's application for relief on November 15, 1994. The Board's rationale was that LTC Bond was not in the proper duty category to apply for

---

1. Effective October 5, 1994, pursuant to § 1662(i)(1), (2) of Pub.L. No. 103–337, 108 Stat. 2998, this section was recodified at 10 U.S.C. § 12686 (1994 & Supp. II 1996).

2. Compare 10 U.S.C. § 8911 (1988), as amended, 10 U.S.C. § 8911 (1994 & Supp. IV 1998) (active duty officer retirement pay) with 10 U.S.C. § 1331 (1988), as recodified and amended, 10 U.S.C. § 12731 (1994 & Supp. IV 1998) (reserve retirement pay).

3. As amended on December 30, 1987 by Pub.L. No. 100–224, 101 Stat. 1538, § 4, § 1163(d), ADT was excluded from the sanctuary provisions.

4. Active duty for support (ADS) tours are tours of duty in which training for the service member is not the primary objective. Air Force Regulation (AFR) 35–41, vol. 2, ¶ 6–8(b) (May 1, 1992).

sanctuary status, and that unit commanders have the discretion to characterize duty as either ADT or ADS. LTC Bond subsequently filed suit in the United States Court of Federal Claims.

On March 4, 1996, in support of his cross-motion for summary judgment, LTC Bond submitted several documents to the court that were not part of the administrative record before the AFBCMR. The Air Force filed a motion to remand the case to the AFBCMR to allow the board to consider the new evidence.[5] Pursuant to court order, the parties submitted a joint status report discussing the new evidence and addressing whether a remand was appropriate. LTC Bond opposed the remand.

On July 26, 1996, the court remanded the case to the AFBCMR to review the new evidence and to answer four specific questions raised by the court. The questions were as follows: 1. At the times relevant to this case, was there any Air Force policy for monitoring or assigning to particular types of duty those officers nearing 18 years of active duty service? 2. Did LTC Bond or the Air Force take any steps to enable the plaintiff to remain on active duty? 3. Did LTC Bond have the right to appeal the assignment at issue to Headquarters, United States Air Force Reserves or to another office, and did

he take advantage of any appeal rights? 4. Did LTC Bond's orders place him in a job with primary training content as a part of the duty? If so, did he receive that training? If LTC Bond did not participate in the training, indicate the reason. Did the training contemplated in LTC Bond's assigned duties fit within the definition of active duty for training in military regulations, to include 32 C.F.R. § 102.4(e)(3)?

On October 31, 1996, ARPC/JA issued an advisory opinion to the AFBCMR, responding to the four questions raised by the court. Regarding question one, ARPC/JA responded that prior approval of HQ USAF was required to permit a reservist to voluntarily enter the sanctuary zone.

Regarding question two, ARPC/JA responded that Mr. Bond had requested in writing that his SIOP duty orders be changed from ADT to ADS on December 21, 1992, while serving on the second day of his two-day SIOP tour.

Regarding question three, ARPC/JA responded that a reservist has a number of avenues available to pursue the redress of grievances. However, a reservist not on extended active duty, such as Mr. Bond, has no right of appeal from an unfavorable person-

5. None of the documents contained in the appendix to the March 4, 1996 brief filed by LTC Bond were in the original administrative record. These documents included the following: 1) Memorandum from John A. Loshe, COL, USAF, Deputy Chief of Staff, Personnel, Headquarters Air Force Reserve, Robins AFB, Ga. to 434 CGS/DPM (Jan. 11, 1992) (the memorandum discussed Air Force policy against voluntary entry into the sanctuary zone, without prior approval from Headquarters, USAF Reserves); 2) Memorandum from Thomas W. Butz, LTC, USAFR, Director of Personnel, Headquarters 434th Air Refueling Wing, Grissom AFB, Ind. to 434 AREFW/DO (Feb. 7, 1992) (the memorandum restated Air Force policy against voluntary entry into the sanctuary zone by a service member through an ADS tour without prior approval from Headquarters, USAF Reserves and listed five officers in the 434th Air Refueling Wing, including LTC Bond, whose duty status needed to be monitored because they were near the sanctuary zone); 3) Memorandum from John J. Batbie, COL, USAFR, Commander, Headquarters 434th Air Refueling Wing, Grissom AFB, Ind. to 434 AREFW/DO (Apr. 3, 1992) (the memorandum listed officers in the 434th Air Refuel-

ing Wing, including LTC Bond, who were near the sanctuary zone and stated these individuals will pull alert tours only in ADT status and will have some type of training scheduled during their tours as a mandatory requirement); 4) Memorandum from Douglas W. Moser, LTC, USAFR, Assistant Deputy Commander for Operations, 434th Air Refueling Wing, Grissom AFB, Ind. to 434 AREFW/CC (undated) (the memorandum recommended procedures to identify service members near the sanctuary zone and to document scheduled ground training to meet ADT requirements; at the bottom of the memorandum are hand written comments initialed by COL Batbie, stating that "documentation [of training] is *not* required" (emphasis in original), and that "[i]ndividuals will self study appropriate ground training items as mission requirements allow."); 5) Letter from Ann M. Owen, TSGT, USAFR, Freedom of Information Act Manager, 434th Air Refueling Wing, Grissom AFB, Ind. to Gary Myers and Associates (Nov. 22, 1995) (the letter is a response to a request from LTC Bond's attorney for the duty status of reservists who participated in the December 1992 SIOP alert at Grissom AFB).

nel decision by a commanding officer. Nor was there any procedure, at the time, for Mr. Bond to appeal the administrative decision that he would not be placed in ADS status to the Chief, United States Air Force Reserves. The only administrative avenue available to Mr. Bond was to seek relief from the AFBCMR.

Regarding question four, ARPC/JA responded by quoting from COL Batbie's letter dated April 3, 1992, which stated that "[r]eserve training of some type" was a mandatory requirement of SIOP alert tours. The ARPC/JA determined that "to the best of our knowledge" all duty performed by Mr. Bond during the SIOP tour was properly classified as ADT. The ARPC/JA concluded by adhering to its October 25, 1993 advisory opinion, and recommended that the AFBCMR deny Mr. Bond's request.

On November 20, 1996, the Air Force Reserve Directorate of Personnel (AFRES/DP) issued an advisory opinion recommending that Mr. Bond's request to remain on active duty be denied. On December 18, 1996, the Air Force Reserve legal office (AFRES/JA) issued an advisory opinion concurring with the two previous ARPC/JA opinions. AFRES/JA further held that Air Force policy on types of duty for reservists approaching the sanctuary zone was "a completely appropriate exercise of force management discretion" and that COL Batbie was complying with that policy. In addition, AFRES/JA determined that LTC Bond never accrued the right to remain on active duty because he was "properly on active duty for training orders" and had made no prior request for approval for ADS orders from AFRES. AFRES/JA concluded that LTC Bond's new evidence should not change the outcome of the AFBCMR.

On April 30, 1997, the Air Force Reserve Director of Personnel (AFRC/DP) issued its advisory opinion. The AFRC/DP reported that, according to the chief navigator from LTC Bond's unit, during a normal alert, crew members "normally spend the morning doing duties that support unit training." The AFRC/DP then concluded that it could be assumed that LTC Bond performed similar tasks during his SIOP training. However, the AFRC/DP conceded that actual training records are not available for the period in question. In addition, the AFRC/DP stated that "while the SIOP alert would normally be considered a support mission [i.e., active duty other than for training]," LTC Bond's commander "exercised proper authority" in issuing ADT orders because this is a "discretionary decision of the commander, as he/she alone is charged with managing unit funding, personnel and mission accomplishment."

On October 16, 1997, LTC Bond, through counsel, responded to the four aforementioned advisory opinions (October 31, 1996; November 20, 1996; December 18, 1996; and April 30, 1997). A supplemental response was submitted on November 26, 1997. On February 4, 1998, the AFBCMR again denied LTC Bond's application for relief, finding that assigning appropriate duty codes "is a discretionary decision of the commander" and that LTC Bond had "performed some training during the period in question, albeit not as extensive as the applicable regulation seems to contemplate." The AFBCMR concluded that, because LTC Bond was serving on ADT, not ADS, orders when he applied for sanctuary status, he was ineligible for sanctuary status.

The AFBCMR responded to the court's four questions as follows:

Regarding question one, the AFBCMR adopted the response of ARPC/JA, noting that prior approval of HQ USAF was required to permit a reservist to voluntarily enter the sanctuary zone.

Regarding question two, the AFBCMR adopted the response of ARPC/JA, noting that LTC Bond had requested that his SIOP duty orders be changed from ADT to ADS.

Regarding question three, the AFBCMR adopted the response of ARPC/JA, noting that a reservist has a number of avenues available to pursue the redress of grievances. However, as a reservist not on extended active duty, LTC Bond had no right of appeal from an unfavorable personnel decision of his commanding officer. Nor was there any procedure, at the time, for Mr. Bond to appeal the administrative decision that he would not be placed in ADS status to the Chief, United

States Air Force Reserves. The only administrative avenue pursued by Mr. Bond was to seek relief from the AFBCMR.

Regarding question four, the AFBCMR adopted the response of ARPC/JA and made some additional findings. The AFBCMR found that LTC Bond's orders "did not place him in a job with primary training content," but they did place him in "special ADT," which "appears to have mandated that he be placed into a job with primary training content as part of his duty." The AFBCMR further found that LTC Bond "performed some training during the period in question, albeit not as extensive as the applicable regulation seems to contemplate," and found "no basis to conclude that he should have performed this duty as ADS and therefore qualified for the sanctuary zone." The AFBCMR acknowledged a commander's discretion to assign appropriate TCCs [Training Category Codes] and concluded that "[t]o have given [LTC Bond] ADS orders on this occasion would have violated HQ USAF policy."

Other than his application for relief from the AFBCMR, LTC Bond pursued no avenues of redress. He had no right of appeal from COL Batbie's decision. No mandatory grievance procedure or appeal existed that precluded him from commencing this lawsuit.

In his supplemental motion for summary judgment, filed July 27, 1999, plaintiff contends that the February 4, 1998 decision of the AFBCMR should be nullified because two out of three of the panel members were on the November 16, 1994 board that considered LTC Bond's original application for relief. Plaintiff alleges that the Air Force "no doubt bent over backwards to scrounge around to find *at least two of the three original panel members* to constitute the same majority to hear the claim again," because, "at stake was a decision that, if adverse to the agency, would profoundly alter Air Force personnel policy on activating reservists" (emphasis in original). While conceding that convening the same board members to recon-

sider a case may be efficient, plaintiff nonetheless contends that this practice will give rise to "riding roughshod over the policies of 'independence and integrity of the board process' . . . ." Plaintiff also contends that this Air Force practice is contrary to the practice of all other service boards, which convene an entirely new panel to review new evidence, and is contrary to congressional intent that service boards dispense uniform, fair, independent decisions. Defendant responds that because the other services have different practices with respect to how to handle matters on reconsideration does not, in and of itself, render the Air Force's practice arbitrary and capricious. Defendant adds that a Department of Defense (DoD) report on military correction boards noted, but did not criticize or make recommendations, for changing the Air Force's practice.

## DISCUSSION

This case presents five issues. First, whether the decision to classify LTC Bond's duty orders as ADT presents the court with a justiciable issue; second, whether reconsideration of the plaintiff's case by a majority of the same board members who had reviewed plaintiff's original application for relief is an abuse of discretion and requires the court to set the board's decision aside and review the case *de novo*, or remand to a fresh correction board; third, whether LTC Bond was serving his tour in an ADT or ADS status; fourth, whether the AFBCMR's decision denying LTC Bond's application for relief was arbitrary or capricious, contrary to law or regulation, or unsupported by substantial evidence; and fifth, whether the decision to deny LTC Bond's request to remain on active duty under the 18 year sanctuary rule of 10 U.S.C. § 1163(d) (1988) was proper.

Defendant has filed a motion to dismiss for failure to state a claim on which relief can be granted pursuant to Rule 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC).[6] In the alternative, defen-

---

6. The court notes that the defendant's contention that the present claim is nonjusticiable is normally addressed as a RCFC 12(b)(4) failure to state a claim upon which relief can be granted. *See Baker v. Carr*, 369 U.S. 186, 196–98, 82 S.Ct.

691, 7 L.Ed.2d 663 (1962); *Deshauteurs v. United States*, 39 Fed.Cl. 263, 270 n. 9 (1997) (citing *Torres v. United States*, No. 148–80C, 1980 WL 99663, at *1 (Fed.Cir. Oct. 24, 1980) (unpub.));

dant has filed a motion for judgment on the administrative record pursuant to RCFC 56.1. Plaintiff has filed a motion for judgment on the administrative record, or, in the alternative, for the court to review the case *de novo* or remand to a fresh correction board.

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4),[7] has been articulated by the United States Supreme Court and the United States Court of Appeals for the Federal Circuit, as follows: "in passing on a motion to dismiss ... for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989). When deciding on a motion to dismiss based on either lack of subject matter jurisdiction or failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Miree v. DeKalb County*, 433 U.S. 25, 27, 97 S.Ct. 2490, 53 L.Ed.2d 557 n.2 (1977); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1287 (Fed.Cir.1999), *reh'g denied* (2000) (citing *Ponder v. United States*, 117 F.3d 549, 552–53 (Fed.Cir.1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1040, 140 L.Ed.2d 106 (1998)); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d 1166, 1169–70 (Fed.Cir.1995). When construing the pleadings pursuant to a motion to dismiss, the court should not grant the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. 1683 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted)); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d at 1287; *Ponder v. United States*, 117 F.3d at 552; *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d at 1169. "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). However, because granting a motion to dismiss for failure to state a claim upon which relief can be granted summarily terminates the case on its merits, courts broadly construe the complaint. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d at 1287 (citing *Ponder v. United States*, 117 F.3d at 552–53).

## I. Justiciability

The courts have historically accorded substantial deference to military actions, particularly routine, day-to-day, administrative decisions. *See Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953), *reh'g denied*, 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953); *Voge v. United States*, 844 F.2d 776, 779–80 (Fed.Cir.1988), *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988); *Gilchrist v. United States*, 33 Fed.Cl. 791, 799 (1995); *Rice v. United States*, 31 Fed.Cl. 156, 165–66 (1994), *aff'd*, 48 F.3d 1236 (Fed.Cir.1995) (table); *Sebra v. Neville*, 801 F.2d 1135, 1141 (9th Cir. 1986); *Wilson v. Walker*, 777 F.2d 427, 429 (8th Cir.1985); *Schlanger v. United States*, 586 F.2d 667, 671–72 (9th Cir.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Noyd v. McNamara*, 378 F.2d 538, 540 (10th Cir.1967), *cert. denied*, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967). "Strong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters." *Sanders v. United States*, 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979). However, although the deference accorded to military actions by the judiciary is substantial, it is not unlimited.

"This court has consistently recognized that, although the merits of a decision

Mindes v. Seaman, 453 F.2d 197, 198 (5th Cir. 1971).

7. RCFC 12(b)(4) is equivalent to Federal Rule of Civil Procedure 12(b)(6). *See Wheeler v. United States*, 11 F.3d 156, 158 n. 4 (Fed.Cir.1993).

committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy." *Adkins v. United States,* 68 F.3d 1317, 1323 (Fed.Cir. 1995), *reh'g denied* (1996). A military decision may be challenged if there is a specific constitutional, statutory, or regulatory violation. *See Wilson v. United States,* 24 Cl.Ct. 842, 845 (1992). Regarding regulatory challenges, "[it] has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all. . . ." *Voge v. United States,* 844 F.2d at 779. Similarly, in *Sargisson v. United States,* the court noted that, "[t]he statute does not place any procedural or substantive limitations on the Secretary's discretion. Nevertheless, once the Secretary promulgated regulations and instructions . . . his action became subject to judicial review for compliance with those regulations and instructions, even though he was not required to issue them at all." *Sargisson v. United States,* 913 F.2d 918, 921 (Fed.Cir. 1990) (citation omitted), *reh'g denied* (1990). *See also Denton v. Secretary of the Air Force,* 483 F.2d 21, 25 (9th Cir.1973) ("[A]dministrative decisions are subject to review, and can be judicially held invalid, on the ground that the Secretary has failed to follow his own valid regulations."), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974).

When the military is given unlimited discretion by Congress, it is nevertheless bound to follow its own procedural regulations if it chooses to implement some. But the utility of the distinction between procedural and substantive matters in assessing a court's ability to review military decisions should not be overemphasized. On procedural matters, the test or standard is inherent. A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion. The court is not called upon to exercise any discretion reserved for the military, it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard. *Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir.1993) (citation omitted), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994), *reh'g denied,* 511 U.S. 1118, 114 S.Ct. 2123, 128 L.Ed.2d 681 (1994).

In the instant case, defendant argues that plaintiff's assignment to a particular military duty is an entirely discretionary command decision which is nonjusticiable. Plaintiff asserts, however, that there are objective, discernable regulatory standards that must be followed when a commander assigns training category codes (TCCs) to a reservist's duty orders. Further, plaintiff argues that it is within the competency of this court to determine whether these standards were properly applied in this case. Plaintiff points to both Air Force [8] and Department of Defense [9] regulations which define in considera-

---

8. Air Force regulations provide, in pertinent part:
   a. Special tours of ADT may be used to maintain or increase the member's mobilization readiness in support of reserve needs. Authorized ADT must provide a primary training content to the member during tours involving organized and planned specialized skill training, flight training, combat crew training, unit conversion training, refresher and proficiency training, officer acquisition training, professional development education programs, etc.
   b. Special tours of ADS may be used for projects that directly support reserve component programs (located at active or reserve component agencies) in which training for the member itself is not the primary objective, but a significant outcome. ADS projects include annual screening, unit

conversions to new weapons systems, projects supporting study groups, training sites and exercises, short-term mission projects, administrative support functions, conferences, and staff visits.
   c. Commanders or their designated representatives have the authority to determine the appropriate training category codes (TCC) to be used for ADT and ADS tours and must make sure appropriate TCCs are placed in all ADT and ADS orders.
   Air Force Regulation (AFR) 35–41, vol. 2, ¶ 6–8 (May 1, 1992).

9. Department of Defense (DOD) regulations, in pertinent part, provide:
   § 102.4(e)(3): ADT is authorized to provide for full-time attendance at organized and planned specialized skill training, flight training, combat crew training, unit conversion

ble detail the distinction between ADT and ADS (or ADSW, Active Duty for Special Work). Plaintiff also highlights a key distinction between the two types of duty contained within the definition, and states that "ADT *must* provide a primary training content to the member..." (emphasis added).

Defendant counters that these service regulations chiefly contain definitions of ADT and ADS and that these definitions are not procedural standards. Defendant argues that the case is nonjusticiable because these regulations provide no guidance for evaluating "whether a proper assignment was made, absent a substantive review of the underlying reasons for making any particular duty assignment." Such a review, defendant continues, "would simply result in the court substituting its own judgment for that of the military." Relying on several cases as precedent, but without offering specific page citations,[10] defendant asserts that the court may not review "assignments to particular military duties, inquiries conducted into those assignments, or inquiries into the purposes behind those assignments."

The cases cited by the defendant each turn on the existence of and agency compliance with, tests and standards in statutes and regulation, as does the instant case. The court in *Sebra* declined to review a military transfer, stating, "the military would grind to a halt if every transfer were open to legal challenge." *Sebra v. Neville*, 801 F.2d at 1141. *Wilson* and *Schlanger* involved challenges to changes in duty assignments following a disciplinary infraction, *Wilson v. Walker*, 777 F.2d at 428, and a removal for "lack of officer potential," *Schlanger v. United States*, 586 F.2d at 668. *Noyd* was a constitutionally-based challenge to an assignment by a military officer who had become a conscientious objector. *Noyd v. McNamara*, 378 F.2d at 539. Neither *Sebra, Wilson, Schlanger,* or *Noyd* involved tests and standards available for the courts to apply. In *Voge*, the court held that it could review procedural violations regarding denial of additional special medical pay to a Navy medical officer because the Secretary of the Navy had prescribed procedural regulations to be followed when terminating such an entitlement, but that the court could not review the merits of the denial. *Voge v. United States*, 844 F.2d at 779–80.

Of particular interest is the often quoted *Orloff* case. *Orloff* involved three assignment related issues. First, Dr. Orloff, a psychiatrist who was inducted into military service under a special law to draft medical doctors, challenged the Army's right to assign him to duty as a medical laboratory technician. Second, he challenged the Army's right to deny him an officer's commission. Third, plaintiff challenged restrictions on his scope of practice. *Orloff v. Willoughby*, 345 U.S. at 87, 73 S.Ct. 534. After initially assigning Dr. Orloff as a laboratory technician, the Army eventually reassigned him to duties as a medical officer. *Id.* at 85, 93, 73 S.Ct. 534. However, because

---

training, refresher and proficiency training, officer acquisition training, professional development education programs, etc., for providing R[eserve] C[omponent] members with necessary skills and disciplines supporting RC missions. Authorized ADT must provide a primary training content to the recipient. Authorization for ADT shall be managed IAW DoD Directives established by the Secretaries concerned.

§ 102.4(e)(4): AD for special work (ADSW) is authorized for personnel from applicable military or Reserve personnel appropriations for projects supporting active or RC programs, such as annual screening, operation of training camps, training ships, and unit conversions to new weapons systems, when such duties are essential to the organization. Projects supporting study groups, training site and exercises, short-term mission projects, and adminis-

trative support functions also are included. Authorization of ADSW shall be managed IAW DoD Directives established by the Secretaries concerned.

§ 102.5(b)(3): The Secretaries of the Military Departments and the Commandant of the United States Coast Guard (USCG) shall: ... [e]nsure that RC members receive training and serve on AD IAW the minimum criteria established....

32 C.F.R. §§ 102.4(e)(3), (4), 102.5(b)(3) (1992).

10. *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Voge v. United States*, 844 F.2d 776 (Fed.Cir.1988); *Sebra v. Neville*, 801 F.2d 1135 (9th Cir.1986); *Wilson v. Walker*, 777 F.2d 427 (8th Cir.1985); *Schlanger v. United States*, 586 F.2d 667 (9th Cir.1978); *Noyd v. McNamara*, 378 F.2d 538 (10th Cir.1967).

Dr. Orloff refused to execute the loyalty certificate required of commissioned officers, the Army restricted him from administrating certain drugs and treatments on his military patients. *Id.* at 93, 73 S.Ct. 534. The United States Supreme Court ruled for the government on all three issues, upholding the discretion of the military to make administrative decisions regarding a service member's duty assignments. *Id.* at 93–95, 73 S.Ct. 534.

Regarding the Army's right to assign a physician to duty as a medical laboratory technician, the court relied on statutory language that invested the Secretary of the Army with the power to assign medical officers to medical duties as the needs of the service required. *Id.* at 88, 73 S.Ct. 534. The Army's right to deny a service member an officer's commission was held to be discretionary, because "Congress has authorized the President alone to appoint Army officers...." *Id.* at 90, 73 S.Ct. 534. The court refused to address the restrictions the Army placed on Dr. Orloff's medical duties, reasoning that specific assignments to duty within a general field are not reviewable. "[W]e have found no case where this Court has assumed to revise duty orders as to one lawfully in the service." *Id.* at 94, 73 S.Ct. 534. It is important to note that in making this statement, the Court was referring to duty assignments that were not governed by a controlling regulation or statute, which renders this aspect of the *Orloff* ruling distinguishable from the case at bar. As the Supreme Court clarified in *Orloff*: "We agree that the statute [for the conscription of medical personnel] should be interpreted to obligate the Army to classify specially inducted professional personnel for duty within the categories which rendered them liable to induction. It is not conceded, however, that particular duty orders within the general field are subject to judicial review...." *Id.* at 88, 73 S.Ct. 534.

Furthermore, the United States Supreme Court in *Orloff* noted that the Army's original argument, advanced in the trial and appellate courts (but withdrawn in the Supreme Court) that the Army had unbridled discretion to assign doctors who were drafted for any purpose the Army saw fit was flawed.

"To separate particular professional groups from the generality of the citizenship and render them liable to military service only because of their expert callings and, after induction, to divert them from the class of work for which they were conscripted would raise questions not only of bad faith but of unlawful discrimination." *Id.* at 88, 73 S.Ct. 534. The Army's discretion in assigning Dr. Orloff was not unlimited because the statute governing the induction of doctors legally obligated the Army to assign doctors to "duties falling within 'medical and allied specialist categories.'" *Id.* at 92, 73 S.Ct. 534.

The case before this court involves the application of a regulation-driven classification scheme governing reserve military duty assignments. Such assignments are either active duty for training, ADT or active duty for support, ADS. The appropriate Training Category Codes (TCCs) establish whether a reservist will be performing an ADT or ADS tour of duty. The distinguishing characteristic between these two types of tours is whether the duty provides "primary training content to the recipient," which distinguishes the ADT tour. ADS tours count for reaching the 18 year sanctuary; ADT tours do not. As the United States Court of Appeals in Adkins stated:

> Not every claim arising from a military decision presents a nonjusticiable controversy.... This court has consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy. *See, e.g., Murphy,* 993 F.2d at 873 ("A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion."); *Dodson v. Department of Army,* 988 F.2d 1199, 1207 n. 7 (Fed.Cir.1993) (reviewing the procedural regularity of the challenged action, but not the substance of the Army's decision); *Sargisson,* 913 F.2d at 921 (although the "statute does not place any procedural or substantive limitations on the Secretary's discretion[,] once the Secretary promulgated regulations and instructions and made

them the basis for [the challenged decision,] his action became subject to judicial review for compliance with those regulations and instructions." (citation omitted)); *Voge*, 844 F.2d at 779 ("[T]he Claims Court may review the [challenged] process for compliance with established procedures."); *Koster v. United States*, 231 Ct.Cl. 301, 685 F.2d 407, 412 (1982) (finding jurisdiction to review procedural aspects of a decision of the Secretary of the Army, acting on behalf of the President).[11] Other Circuit Courts of Appeals have recognized a similar distinction. *See, e.g., Watson v. Arkansas Nat'l Guard*, 886 F.2d 1004, 1011 n. 16 (8th Cir.1989) ("[A]djudication of [plaintiff's] claims requires the district court to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct."); *Kreis v. Secretary of Air Force*, 866 F.2d 1508, 1511 (D.C.Cir.1989) (same).

In cases in which procedural violations are alleged, the test or standards against which this court measures the military's conduct are inherent: they are the applicable statutes and regulations. *See Murphy*, 993 F.2d at 873. In such instances, this court does not improperly exercise any discretion reserved for the military; "it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard." *Id. Adkins v. United States*, 68 F.3d at 1323. This court finds that the guidance for classifying types of military duty found in both Air Force and Department of Defense regulations provides standards that allow the court to determine whether an appropriate duty classification was made in the instant case.

Accordingly, the decision to classify LTC Bond's duty orders as ADT presents the court with a justiciable issue.

The parties have filed cross motions seeking judgment on the administrative record, and RCFC 56.1 treats such motions as motions for summary judgment under RCFC 56(a). *Nickerson v. United States*, 35 Fed. Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255 (Fed. Cir.1997) (table). Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Addickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc.*

---

**11.** The Federal Circuit included a footnote at this point:

Compare *Murphy*, 993 F.2d at 873 ("[W]hen the military is given unlimited discretion by Congress, it is nevertheless bound to follow its own procedural regulations if it chooses to implement some.") with *Law v. United States*, 11 F.3d 1061 (Fed.Cir.1993). In *Law*, the plaintiff challenged his removal from the list of officers to be promoted to lieutenant commander in the United States Coast Guard. One of the statutes at issue provided that "[t]he President may remove the name of any officer from a list of selectees established under section 271 of this title." 14 U.S.C. § 272(a)

(1994). Law argued that, when the Secretary of Transportation—acting for the President—removed Law's name from the promotion list, the removal was defective because he failed to afford Law various procedural safeguards. In rejecting Law's claim, we quoted § 272(a), and then stated that "Congress has not imposed the procedural limitations on the President's exercise of the authority which appellant asserts. It would be outside our province to create them." *Id.* at 1068. Thus in *Law*, unlike in *Murphy*, the plaintiff alleged no statutory or regulatory standards against which to judge the military's conduct.

*Adkins v. United States*, 68 F.3d at 1323 n. 8.

*Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). A fact is material if it will make a difference in the result of a case. *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Summary judgment "saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. 'Useless' in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result." *Dehne v. United States*, 23 Cl. Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *Lane Bryant, Inc. v. United States*, 35 F.3d 1570 (Fed.Cir. 1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991) (table). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.* at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.1998), *reh'g denied* (1998); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima*

*Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur., Co.,* 528 F.2d 1388, 1390 (2d Cir. 1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir. 1968); *Bataco Indus., Inc. v. United States,* 29 Fed.Cl. 318, 322 (1993), *aff'd,* 31 F.3d 1176

(Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d at 1391.

Neither party has argued that there are material facts in dispute in the case. After an examination of the record and the parties' pleadings, the court agrees. Therefore, this case is ripe for judgment on the administrative record.

## II. Correction Board Composition

■ Section 1552 of title 10 gives the Secretary of a military department the power to correct military records through civilian boards.[12] Each military department is given the power to issue regulations and procedures that govern the operation of such boards.[13] 10 U.S.C. § 1552 (1994). Regulations governing the operation of the Air Force Board for the Correction of Military Records (AFBCMR) are codified at 32 C.F.R. §§ 865.0–865.8 (1997). Section 1552 of title 10 does not limit the kind of military records subject to correction.

Plaintiff contends that the AFBCMR acted arbitrarily and capriciously when it remanded LTC Bond's application for relief to a panel composed of some of the same members who had reviewed and denied LTC Bond's original application for relief. Calling this a "fundamental abuse of administrative process," plaintiff asks the court to set the February 1998 decision of the AFBCMR aside. Defendant acknowledges that two of the three panel members sat on both boards,[14] however, the defendant contends that LTC Bond's allegations of bias by the second board are unfounded.

There is considerable case law addressing board composition and bias. *See, e.g., Stew-*

---

**12.** "The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice....[S]uch corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department." 10 U.S.C. § 1552(a)(1) (1994).

**13.** "Corrections under this section shall be made under procedures established by the Secretary concerned." 10 U.S.C. § 1552(a)(3) (1994).

**14.** The original panel consisted of Henry C. Saunders, Chairman; Benedict A. Kausal IV, and C. Bruce Braswell. The second panel consisted of Mr. Saunders, Mr. Kausal, and a new member, Charles E. Bennett. Mr. Saunders served as panel chairman on both panels.

art v. United States, 222 Ct.Cl. 42, 50, 611 F.2d 1356, 1361 (1979) ("Where a selection board is not properly constituted, it is legal error.") (Air Force board); Doyle v. United States, 220 Ct.Cl. 285, 296, 599 F.2d 984, 992 (1979), amended, 220 Ct.Cl. 326, 609 F.2d 990 (1979), cert. denied, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980) (holding the original Army boards were improperly constituted because they did not include any reserve officers); Yerxa v. United States, 11 Cl.Ct. 110, 127–28 (1986) (holding an Air Force selection board was defective because it did not include enough reserve officers), aff'd, 824 F.2d 978 (1987) (table); Henderson v. United States, 175 Ct.Cl. 690, 698–99 (1966), cert. denied, 386 U.S. 1016, 87 S.Ct. 1373, 18 L.Ed.2d 455 (1967) (Because a member of an Air Force board was junior in rank to the applicant, board composition was faulty. Board actions were held to be void ab initio from the resulting lack of a quorum.); Ricker v. United States, 184 Ct.Cl. 402, 405, 396 F.2d 454, 455 (1968) (a Navy continuation board was held to be faulty and its proceedings defective because one of three board members had served on a prior board that had considered applicant's continuation status under a specific statute.); Evensen v. United States, 228 Ct.Cl. at 210, 654 F.2d at 70 (invalidating an Army board's decision because the board's composition was identical to a previous board that had ruled adversely to applicant); Horn v. United States, 230 Ct.Cl. 18, 24, 671 F.2d 1328, 1331 (1982) (quoting Evensen v. United States, 228 Ct.Cl. at 213, 654 F.2d at 72: "Where, as here, the defect goes to board composition, rather than to the contents of an officer['s] OERs or files ..., automatic voiding of the [Army promotion board's action] is justified".). In Palmer v. United States, 6 Cl.Ct. 541, 543 (1984) and Bockoven v. Marsh, 727 F.2d 1558, 1564 (Fed.Cir.1984), cert. denied, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984), no bias was found in cases in which boards that reviewed records of reservists had some reservists serving on them, but not in similar proportion to the proportion of reservists in the reviewed population; cf. Coughlin v. Alexander, 446 F.Supp. 1024, 1026–27 (D.D.C.1978), aff'd, 589 F.2d 1115 (D.C.Cir.1978) (table) in which the court held

that there was no bias in having the same members serve on successive Army review boards. However, in Evensen v. United States, 228 Ct.Cl. at 213 n. 7, 654 F.2d at 72 n. 7, the United States Court of Claims expressed its disapproval of Coughlin.

In all of the cases cited above, the court buttressed its opinion by pointing to governing regulations, statutes, or directives that specifically addressed board composition. For example, in Evensen, five members of a regular promotion board and, subsequently, the same five members in a standby advisory (promotion) board considered Major Evensen for promotion, with both boards recommending nonselection for promotion to lieutenant colonel. Evensen v. United States, 654 F.2d at 69–70. Identical board membership, considering the same record for promotion, was forbidden by an Army regulation and an Army instruction. Id. at 70–71. Under the circumstances presented, the United States Court of Claims found that Major Evensen had been improperly released from active duty, based on the two nonselection for promotions. Id. at 75. In contrast to Evensen, in the instant case, the governing regulations are silent on correction board composition. See 10 U.S.C. § 1552 (1994); 32 C.F.R. §§ 865.0–865.8 (1997). "[F]ederal employees may not be entitled to any procedure not established by Congress or agency" although "they are entitled to such procedure that has been so provided." Doyle v. United States, 220 Ct.Cl. at 302, 599 F.2d at 995. Further, the United States Court of Appeals for the Federal Circuit recently found that Section 1552 of title 10 "conveys broad authority to the corrections boards regarding how they may exercise their statutory responsibilities, and contains no prescriptions on how they may fulfill their statutory charge." Porter v. United States, 163 F.3d 1304, 1324 (Fed.Cir. 1998), cert. denied, —— U.S. ——, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999).

In the instant case, citing to congressionally mandated reforms to ensure the independence and integrity of military correction boards, plaintiff argues that the composition of the remand board was contrary to congressional intent. Plaintiff refers to three pieces of legislative history to support his

argument. First, plaintiff cites the 1996 National Defense Authorization Act, which reads in pertinent part:

Sec. 554. REVIEW OF SYSTEM FOR CORRECTION OF MILITARY RECORDS

(a) Review of Procedures.—The Secretary of Defense shall review the system and procedures for the correction of military records used by the Secretaries of the military departments in the exercise of authority under section 1552 of title 10, United States Code, in order to identify potential improvements that could be made in the process for correcting military records to ensure fairness, equity, and (consistent with appropriate service to applicants) maximum efficiency. The Secretary may not delegate responsibility for the review to an officer or official of a military department.

(b) Issues Reviewed.—In conducting the review, the Secretary shall consider (with respect to each Board for the Correction of Military Records) the following:

(1) The composition of the board and of the support staff for the board.

(2) Timeliness of final action.

(3) Independence of deliberations by the civilian board.

(4) The authority of the Secretary of the military department concerned to modify the recommendations of the board.

(5) Burden of proof and other evidentiary standards.

(6) Alternative methods for correcting military records.

(7) Whether the board should be consolidated with the Discharge Review Board of the military department.

(c) Report.—Not later than April 1, 1996, the Secretary of Defense shall submit a report on the results of the Secretary's review under this section to the Committee on Armed Services of the Senate and the Committee on National Security of the House of Representatives. The report shall contain the recommendations of the Secretary for improving the process for correcting military records in order to achieve the objectives referred to in subsection (a).

National Defense Authorization Act of 1996, Pub.L. No. 104–106, § 554, 110 Stat. 186, 320 (1996).

Second, plaintiff refers to a report from the Senate Committee on Armed Services which accompanied the 1996 National Defense Authorization Act. It reads in relevant part:

The committee recommends a provision that would require the Secretaries of the military departments to review the composition of the Boards for the Correction of Military Records and the procedures used by those boards. The provision would require a report to the appropriate committees of the Senate and the House of Representatives by April 1, 1996.

The committee is concerned about the perception among service members that the boards have become lethargic and unresponsive, and have abdicated their independence to the uniformed service staffs.

These boards are to be the honest broker, the forum for adjudication of claims from service members who allege errors in military records. If these boards become extensions of the military staffs, they will have lost their sole reason for existence.

This provision would require a comprehensive review of the make-up, current board procedures, and recommendations for improving the process. The reports from the military departments would be submitted through the Department of Defense. The committee expects that the Office of the Secretary of Defense will carefully review the reports and, where applicable, standardize processes and procedures to ensure efficiency, effectiveness and responsiveness to the services and service members.

S. Rep. No. 104–112, § 555 at 246 (1995) (not reprinted in U.S.C.C.A.N.).

Finally, plaintiff refers to the Department of Defense Report, National Defense Authorization Act for FY 1996, Section 554: "Review of System for Correction of Military

Records,"[15] issued in response to the congressionally mandated review of the system for correction of military records. The report describes the current system, compares the service boards, discusses issues raised by Congress, and makes recommendations.

Defendant argues, however, that while plaintiff repeatedly invokes congressional intent, plaintiff cites no statute or regulation that the Air Force practice violates. Defendant further contends that the Air Force, like the other services, has the discretion to determine the composition of its correction boards.

There is little evidence in the legislative history to support plaintiff's contentions that having personnel overlap on successive boards for correction of military records violates congressional intent. Congress articulated that its actions were motivated by a "perception among service members that the boards have become lethargic and unresponsive, and have abdicated their independence to the uniformed services." S.Rep. No. 104–112, § 555 at 246 (1995). The Congress mandated the Secretary of Defense to, "review the system and procedures for the correction of military records ... to identify potential improvements that could be made in the process for correcting military records to ensure fairness, equity, and (consistent with appropriate service to applicants) maximum efficiency" of the boards. National Defense Authorization Act of 1996, Pub.L. No. 104–106, § 554, 110 Stat. 186, 320 (1996). Congress further directed the Secretary of Defense to "carefully review the reports and, where applicable, standardize processes and procedures...." S.Rep. No. 104–112, § 555 at 246 (1995).

Clearly, congressional concerns about the lethargy and unresponsiveness of the boards relate to the congressionally mandated goal of maximum efficiency which it directed the Secretary of Defense to achieve.[16] However, Congress also qualified that efficiency had to be "consistent with appropriate service to applicants" and had to be balanced with concerns of equity and fairness. Personnel overlap on successive boards may touch on issues of equity and fairness. However, Congress never expressly raised this issue.

Regarding congressional concerns on the independence of the boards, the Department of Defense Board Review concluded, "[n]o credible evidence suggests that any Military Department's Board is or has been compromised by undue influence by uniformed members or by reason of possible pressure." Department of Defense Board Review, § V(3)(a) at 13. However, the report added, "[w]hile there is no evidence of compromised independence, procedures adopted in some of the boards could give rise to an appearance of a lack of independence." *Id.* § V(3)(b) at 13. The report then cited one example-the Army board's practice of having the case examiner prepare a draft decisional document that is given to panel members when they meet in executive session. The report mentions nothing about board composition impacting the independence of the board. *Id.* § V(3) at 13–14.

Nonetheless, the Department of Defense Board Review is not silent on board composition or fairness and integrity of the board process or system. In comparing the boards across the branches of service, the report notes that in the Air Force reconsidered cases are "sent to the panel that originally considered the case for determination on the merits." *Id.* § IV(5)(b) at 9. Regarding the other services, the report states that in the Army and the Navy remanded cases are "forwarded to the board for action." *Id.*

---

**15.** No date is provided. The Report is hereinafter referred to as the Department of Defense Board Review.

**16.** Other congressional materials, not cited by plaintiff, indicate that a major concern Congress had about military corrections boards was their responsiveness. To enhance board responsiveness, Congress prevented the military departments from reducing board manpower levels and imposed timeliness standards for resolution of applications. Regarding board composition, Congress addressed only one issue, requiring assignment of at least one physician and one lawyer to the boards. Congress also prohibited *ex parte* communications with the boards and slightly widened their scope. Strom Thurmond National Defense Authorization Act for FY 1999, Pub.L. No. 105–261, §§ 541–545, 112 Stat.1920, 2019–22 (1998). The issue of overlap of board composition was not mentioned by Congress.

§ IV(5)(a) at 9 & § IV(5)(c) at 10. Such language does not rule out the possibility that the case will be reviewed by the original panel. Moreover, the report does not condemn the specific practice of remanding a case to the original panel and concludes that "[t]he composition for all three Service boards complies with the enabling statute." *Id.* § V(1)(a) at 10.

In its discussion and analysis section, the report touches on fairness and integrity issues regarding board composition.

> None of the Service Boards has institutionalized a system of screening Board members for potential bias or conflicts. In practice, most members raise the possibility of a conflict on their own. The BCNR [Board of Corrections for Naval Records] and the AFBCMR generally allow panel members to decide whether or not they can act impartially in a given case. The Army will normally refer a case to another panel if a panel member raises a potential conflict issue. The ABCMR [Army Board for Correction of Military Records] has recently adopted a formal recusal policy requiring recusal whenever there is an actual or apparent conflict of interest.

*Id.* § V(1)(f) at 11.

The report encourages the leadership of the boards to "work together to adopt practices and policies to enhance fairness and efficiency". *Id.* § VI(C) at 20. Among issues that deserve attention, the report mentions the need for "[d]eveloping a system for screening Board members for conflicts before acting on a case. To avoid the appearance of impropriety and preserve the integrity of the process, the Boards should consider establishing programs to educate members about standards of impartiality, encourage members to raise potential conflicts, institutionalize procedures to screen for conflicts, and adopt a formal recusal policy." *Id.* § VI(C)(1) at 20. Although the report recommends that "[t]he Military Department Secretaries and the leadership of the Corrections Boards should reexamine existing policies and procedures that could impact on the integrity of the decision-making process or create the appearance of impropriety" and suggests some specific issues for review, the report does not identify personnel overlap on successive boards as a potential issue of concern. *Id.* § VI(D) at 20. The report concludes by recommending the establishment of a working group to address the concerns identified.

Summarizing, the applicable enabling statute, 10 U.S.C. § 1552, grants the Secretary of Defense broad discretion in how military correction boards may function. It is silent on board composition. The National Defense Authorization Act of 1996 mandated a review of the military correction board system and a report with recommendations to Congress. The statute does not mandate the Secretary of Defense to standardize the processes and procedures of the military correction boards. Plaintiff has failed to raise any constitutional, statutory, or regulatory grounds for this court to declare the actions of the AFBCMR an abuse of discretion due to its composition.[17]

---

**17.** In *Neal v. Secretary of Navy*, 639 F.2d 1029, 1042 (3d Cir.1981), in dicta, the Third Circuit noted:

> Ordinarily, the procedural requirements which an agency must follow are those set by its governing statute or regulations. However, as the Supreme Court recognized ... "[t]his is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). [The *Vermont Yankee* opinion further stated at this point, "[b]ut such circumstances, if they exist, are extremely rare."] Courts have undertaken to consider the procedure followed by the agency

when the procedural defects allegedly rise to the level where they may affect the integrity of the agency's factfinding and decisionmaking. *See, e.g., East Texas Motor Freight Lines, Inc. v. United States*, 593 F.2d 691, 694 (5th Cir. 1979); *Kotakis v. Elgin, Joliet & Eastern Railway Co.*, 520 F.2d 570, 575 (7th Cir.), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975); *S.D. Warren Co. v. NLRB*, 342 F.2d 814, 816 (1st Cir.1965) ...; *United Transportation Union v. Washington Terminal Co.*, 86 CCH Lab. Cas. ¶ 11,508 (D.D.C.1979) ...; *McDonald v. Penn Central Transportation Co.*, 337 F.Supp. 803, 806–07 (D.Mass.1972). In *Neal*, the Third Circuit relied upon the broad statutory language creating the military review board system to find that the system's purpose of correcting injustices implies that military review boards must correct procedures followed by sub-

Plaintiff further argues that the AFBCMR's policies are not immune to judicial review, citing *Natural Resources Defense Council v. Securities & Exch. Comm'n,* 606 F.2d 1031 (D.C.Cir.1979). Contrary to plaintiff's position, however, the court in *Natural Resources Defense Council* held that judicial review of an agency's decision not to adopt rules would only be appropriate in limited circumstances. The court only did so because the agency had held extensive rulemaking proceedings prior to deciding not to issue rules. Moreover, the court held that "[a]n agency's discretionary decision [n]ot to regulate a given activity is inevitably based, in large measure, on factors not inherently susceptible to judicial resolution," such as "weighing of competing policies within a broad statutory framework." *Id.* at 1046. As the *Natural Resources Defense Council* court further stated: "There are an infinite number of rules that an agency could adopt in its discretion; unless the agency has carefully focused its considerations, judicial review will have an undesirably abstract and hypothetical quality." *Id.* at 1046–47. The court clearly rejected a general rule that discretionary agency decisions not to adopt rules are reviewable, except in rare circumstances. *Id.* at 1047.

Plaintiff also argues that the AFBCMR cannot claim reasonable agency discretion in departing from otherwise uniform procedural standards of the correction boards. Plaintiff contends that the AFBCMR must articulate a reasoned explanation for any departure or reversal from standard norms, citing *Vietnam Veterans of America v. Secretary of the Navy,* 843 F.2d 528, 539 (D.C.Cir.1988). These arguments fail because, as discussed above, the governing statute does not mandate uniform procedural standards among all the services. The governing statute, 10 U.S.C. § 1552, is so broad that the Secretary of the Air Force, like other service Secretaries, has the discretion to determine procedural standards for the AFBCMR. In addition,

the instant case involves no change or departure from existing policies or prior norms by the AFBCMR. In asking the court for *de novo* review, plaintiff alleges that the AFBCMR acted in bad faith when it convened a remand board that was substantially similar in composition to the original board that heard LTC Bond's application for relief. Plaintiff further alleges this demonstrates fundamental infirmities of the administrative process that demand intervention of the court to protect the plaintiff and ensure fair proceedings. Defendant counters that plaintiff has not provided proof of bad faith, a requirement to overcome the presumption of good faith dealing accorded to agency officials.

The precedent plaintiff cites in support of intervention by the court, setting aside the Correction Board's decision, and *de novo* review of the present case is not persuasive. In *Gulf Oil Corporation v. United States Department of Energy,* a district court's intervention was justified, since time was a critical issue for preserving a full factual record of misconduct in an ongoing administrative proceeding. The Court of Appeals in *Gulf Oil Corporation* approved the district court's intervention under extraordinary facts not present in the instant case. *Gulf Oil Corp. v. United States Dep't of Energy,* 663 F.2d 296, 307 (D.C.Cir.1981). A military pay case cited by the plaintiff, *Black v. United States,* 24 Cl.Ct. 465 (1991), *aff'd,* 16 F.3d 421 (Fed.Cir.1993) (table), also is not persuasive. According to *Black, de novo* review may apply in military pay cases when courts reviewing administrative decisions "would permit discovery beyond the record where there was a 'strong showing of bad faith or improper behavior' that would 'create serious doubts about the fundamental integrity' of the administrative action." *Id.* at 469 (citing *Long v. United States,* 12 Cl.Ct. 174, 177 n. 2 (1987) (quoting *Sierra Club v. Costle,* 657 F.2d 298, 390 (D.C.Cir.1981))). *Black* is in-

ordinate boards that are "so inherently unfair as to taint the merits of its decision." *Id.* at 1044. Quoting Justice Frankfurter, the court wrote, "The validity and moral authority of a conclusion largely depends on the mode by which it was reached." *Id.* at 1043–44, quoting *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S.

123, 171, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Justice Frankfurter, concurring). In the above captioned case, the Correction Board's composition was not so inherently unfair as to taint the decision; however, as noted below, the court nevertheless finds for the plaintiff on other grounds.

applicable to the instant case because, as noted above, although the Board which reviewed LTC Bond's record did not agree with the plaintiff, the AFBCMR did not act in bad faith with regard to the composition of the remand board and the composition was within the broad discretion granted to the Secretary by the governing statute and regulations. 10 U.S.C. § 1552 (1994); 32 C.F.R. §§ 865.0–865.8 (1997).

Moreover, "[t]he reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* The instant case already has been remanded to the Board to respond to specific questions posed by this court. Accordingly, *de novo* review is denied.

The plaintiff's citation to statute, regulation, and case law has failed to convince the court that a three-member correction board panel, responding to questions remanded from this court, and containing two members from the earlier correction board panel which had considered the plaintiff's application for relief, is legal error. Nevertheless, as is reflected below, the court grants the plaintiff's motion for judgment on the administrative record, rendering moot the plaintiff's concerns about the composition of the reconvened correction board, as well as the plaintiff's request for *de novo* review by the court.

## III. The Nature of LTC Bond's Tour of Duty

■ Similar to the *Orloff* case, in which the military lacked discretion to assign a doctor to non-medical duties, the Air Force, in the instant case, does not have unfettered discretion to assign general duties, such as SIOP training, to a specific TCC. Rather, the Air Force must comply with governing, regulatory definitions in assigning TCCs. The TCC is not a label to be assigned at the convenience of the commander. The nature of the duty or mission determines the TCC. Absent "primary training content to the member," duty cannot be assigned a TCC of ADT.

Defendant argues that AFR 35–41, vol. 2, ¶ 6–8(c) gives commanders the discretion to determine which TCC to use in making duty assignments. However, the scope of this subsection of the regulation is narrower than defendant asserts. AFR 35–41, vol. 2, ¶ 6–8(c), gives commanders authorization to assign TCCs. This authorization clause must be read in context with the rest of the regulation, which places limits on a commander's discretion in assigning TCCs. A commander's authorization is valid only if TCCs are assigned in compliance with the defined classes of duty provided for in AFR 35–41, vol. 2, ¶ 6–8(a) and (b). In context, AFR 35–41, vol. 2, ¶ 6–8(c) does *not* give the commander the discretion to assign duties to either TCC at will. To allow otherwise would enable commanders to undermine the intent of the classification scheme.[18] The governing criterion is whether the duty has a primary training content to the service member. This guidance is highlighted by the closing sentence of the regulation, AFR 35–41, vol. 2, ¶ 6–8(c), which states that commanders "must make sure appropriate TCCs are placed in all ADT and ADS orders."

The facts in the instant case show that COL Batbie, LTC Bond's commander, failed to place LTC Bond in an ADT tour.[19] COL

---

18. The instant case is analogous to employment law cases in which employees are denied benefits through being classified as temporary employees or independent contractors. In one case, the court declared such workers as nevertheless eligible for benefits under the common law definition of an employee. *See Vizcaino v. Microsoft Corp.,* 173 F.3d 713, 716 (9th Cir.1999), *amend-*

ed, 184 F.3d 1070 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000). *See also Herman v. Time Warner,* 56 F.Supp.2d 411, 413, 417–18 (S.D.N.Y.1999).

19. Although not available in 1992, an additional option for a commander today is to secure a waiver of the sanctuary zone privilege from the

Batbie wrote a memorandum on April 3, 1992, titled "Alert tour for Reservists ARTs at or near the sanctuary zone" regarding three LTCs, including the plaintiff, which stated: "Reserve training of some type will also be scheduled during these tours as a mandatory requirement." In a note on an undated memorandum, COL Batbie also wrote that: "Individuals will self study . . . as mission requirements allow." In an uncontroverted, sworn declaration signed by John A. Pence, Executive Assistant to COL Batbie, there appears further information on what occurred:

4. I recognize the signature of Col. John Batbie on the memorandum dated 3 April 1992 from the 434 ARW headquarters. This was Col. Batbie's preliminary guidance regarding assignment and funding codes of those reservists near the sanctuary zone who would perform SIOP alert duty.

5. The memorandum from the ADO, signed by LtCol. Moser, is a proposed implementation of procedures for the SIOP Alerts in 1992. The handwriting and initials on the bottom appear to be that of Col. Batbie. I am personally aware that these final directions written on the bottom were in fact implemented for the SIOP Alerts occurring in December 1992 for those in or near the sanctuary zone. This is because I attended a staff meeting with Col. Batbie earlier in 1992 where he outlined his policy, that it was unnecessary to formally document reserve training during SIOP duty. I then informed Col. Batbie that the regulations and law required that the determining factor in how orders are funded is the mission—whether it is other than for training. Col. Batbie ended the conversation and meeting implying that he alone could decide whatever the funding code would be for these or any other or-

ders regardless of the type of duties performed.

6. I am aware that all reservists who performed the SIOP alert duty in December 1992 at Grissom AFB received active duty funded orders. The exception was those several reservists in or near the sanctuary zone who had a total of 17 years or more active duty. This included LtCol. Bond, who received Active Duty Training (ADT) funded orders for the December SIOP duty. This policy of giving active duty funding to all other reservists for the December 1992 SIOP is confirmed by also reviewing the statistics taken from 434 ARW training records for this duty.

7. The reason for the active duty funding for the December 1992 SIOP duty was that the primary content and purpose was to support the active duty mission—not to conduct reserve training. The Wing's SIOP mission was to fulfill the 434 ARW's obligation to support the National Command Authority's Single Integrated Operating Plan (SIOP) to sustain the national resolve. LtCol. Bond's alert duty played a vital role in the US's Air Borne Command and Control capability and the Country's nuclear triad—missiles, submarines, and bombers. This is confirmed in the advisory opinion dated 30 April 1997, which states that the SIOP alert duty is "normally considered" an active duty support mission. Any conclusion that LtCol. Bond was on active duty for anything but the primary duty of SIOP alert is grasping at straws. There was a very clear understanding by all 434 ARW Air Crew members that their primary duty on alert is the alert mission—no other duty will take precedence. SIOP duty for the 434 ARW in 1992 was never considered an ADT type mission.

service member. As amended on September 23, 1996 by Pub.L. No. 104–201, § 533, 110 Stat. 2520—10 U.S.C. § 12686(b) (Supp. II 1996) states: "(b) WAIVER.—With respect to a member of a reserve component who is to be ordered to active duty (other than for training) under section 12301 of this title pursuant to an order to active duty that specifies a period of less than 180 days and who (but for this subsection) would be covered by subsection (a) [the sanctuary zone privilege or section 1163(d) under the 1992 regulations], the Secretary concerned may require, as a condition of such order to active duty, that the member waive the applicability of subsection (a) to the member for the period of active duty covered by that order. In carrying out this subsection, the Secretary concerned may require that waiver under the preceding sentence be executed before the period of active duty begins."

8. It was the policy of Col. Batbie that the only reason that certain few reservists received an ADT funding code for the December 1992 SIOP duty was to prevent them from entering the sanctuary zone and receiving active duty retirement. The 434 ARW was apparently only looking for a way to utilize officers near or in the sanctuary zone to perform their active duty alert commitment without having to comply with the law. Based upon this policy, I advised LtCol. Bond specifically that he could ask for sanctuary under 10 U.S.C. 1163(d) once he had performed the SIOP alert duty in December 1992. This active duty service was no different than that performed by his fellow reserve crew members that Sunday night and Monday except for the fact that only he and other crew members approaching, or with more than 18 years service to their Country were singled out to receive Active Duty for Training orders (rather than Active Duty as the rest of the crew). When LtCol. Bond assumed alert that Sunday night, he was there for the single purpose of fulfilling the 434 Wing's Active duty commitment. There is simply no other way to construe his purpose in being there. LtCol. Bond was placed on Active Duty Training (ADT) orders solely to nullify his sanctuary rights guaranteed by law. Once LtCol. Bond performed this active duty mission and entered the sanctuary zone, he was entitled to the same sanctuary rights under the law as any other soldier, reserve or regular.

Mr. Pence's comments regarding the December 1992 SIOP are corroborated by unit statistics reflecting that of 101 personnel who participated in SIOP duty in LTC Bond's unit, only two majors and four lieutenant colonels near the sanctuary zone, including LTC Bond, were issued ADT orders; all others, including more junior ranking officers, were issued ADS orders. Indeed, the aircraft commander under whom LTC Bond served during the December 1992 SIOP, LTC Straly, a fellow reservist in the sanctuary zone who completed the SIOP duty under ADT orders, stated in an uncontroverted, sworn declaration that neither he, LTC Bond, nor any other crew member performed any reserve training during the December 1992 SIOP because none was scheduled or planned and the SIOP mission was always the primary purpose.

LTC Straly further commented:

3. Like LTC Bond, my duty orders for the December 1992 SIOP duty were given ADT funding because I was on the sanctuary zone list, but they still needed me as an aircraft commander. All other crew members were given active duty orders if they were not on the sanctuary zone list. It was the definite policy of the 434 that everyone would be given active duty orders for SIOP duty unless they were on the sanctuary zone list. It was well known in the unit that the reason for ADT funding for SIOP duty was not the purpose of the duty, but only to prevent those officers in the zone from entering sanctuary and obtaining active duty retirement.

The only training LTC Bond alleges that he received was a cursory, after-the-fact training session that he was verbally, on the spot, ordered to attend by COL Batbie, immediately after his request for sanctuary was denied and at which point his SIOP duty was terminated.

Defendant argues that the court cannot determine whether a particular duty assignment provides primary training content to the member and that this type of judgment is best reserved to a commander because it involves specialized knowledge and expertise of the military community. By definition, however, ADT requires "full-time attendance at organized and planned [training]." 32 C.F.R. § 102.4(e)(3) (1992). Primary training content cannot be determined with strict mathematical precision, however, the record can be reviewed to determine whether the organized and planned training provided was mere tokenism and fails to fulfill the regulation. Compare, for example, *Yerxa v. United States*, 11 Cl.Ct. 110, 128 (1986) (discussing the number of reserve officers that should sit on promotion boards considering both reserve and regular officers for promotion: "While by our holding we imply no hard and fast rule as to the meaning of the phrase 'an appropriate number of reserves,' we do find,

662

unequivocally, however, that the mere tokenism evident in this case [3–4 percent of the promotion board members were reserve officers, while 25–35 percent of the officers being considered for promotion were reserve officers] fails to fulfill that minimum standard."), aff'd, 824 F.2d 978 (1987) (table).

Defendant argues that the definitions of TCCs given in AFR 35–41, vol. 2, ¶ 6–8(a) and (b) are non-binding because they are "clearly written in permissive terms, i.e. 'ADT may be used' and 'ADS may be used.' " The court is not persuaded by defendant's argument. The discretionary language used in the Air Force regulation is not dispositive of the issue because 32 CFR ch. 1, the controlling authority over the Air Force regulation, does not use discretionary language. 32 C.F.R. §§ 102.4(e)(3) & (4) (1992). "To the extent that [service] regulations conflict with those of the Department of Defense, the service regulations must give way." Casey v. United States, 8 Cl.Ct. 234, 239 (1985). See also Hoskins, 40 Fed.Cl. 259, 273 (1998) ("Department of Defense regulations control when they conflict with regulations promulgated by the Air Force."). Moreover, in raising this argument, defendant overlooks the mandatory language used in defining ADT in its own regulations as well as in Department of Defense regulations, i.e., "ADT must provide a primary training content to the member." Air Force Regulation 35–41, vol. 2, ¶ 6–8a; see also 32 C.F.R. § 102.4(e)(3) (emphasis added). The AFBCMR concluded that LTC Bond was not placed "in a job with primary training content as a part of his duty," but that the evidence indicated LTC Bond performed some training, "albeit not as extensive as the applicable regulation seems to contemplate. . . ." The evidence supports the Correction Boards's factual conclusion that the tour was not one of primary training content. LTC Bond served an ADS tour of duty. Superficial training, or an alleged intent to provide a tour with primary training content, without the actual execution of that intent, did not convert an ADS tour into an ADT tour with primary training content.

## IV. Arbitrary or Capricious

The standard of review for military pay cases is that the court and plaintiff are bound by a Correction Board decision unless the decision is "illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due." Sanders v. United States, 594 F.2d at 811. To overturn a correction board's decision, plaintiff must establish by "cogent and clearly convincing evidence," Cooper v. United States, 203 Ct.Cl. 300, 304 (1973), that a material legal error or injustice occurred in the correction board proceeding and that a nexus exists between the error or injustice and the adverse action. Hary v. United States, 223 Ct.Cl. 10, 15, 618 F.2d 704, 706 (1980). "[P]roof must overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." Sanders v. United States, 594 F.2d at 813.

In the present case, plaintiff contends that the AFBCMR acted arbitrarily and capriciously and contrary to law or regulation by upholding a commander's claim of unlimited discretion to apply training category codes (TCC) to types of duty tours for military reservists. Plaintiff asserts such command discretion is limited and that such discretion is contrary to governing Department of Defense and Air Force regulations that clearly spell out distinctions between active duty for training (ADT) and active duty for support (ADS) duty tours. Plaintiff further claims that the Air Force's actions were arbitrary and capricious because they did not consider the relevant factors outlined in these governing regulations. As noted in our earlier discussion, the court agrees with plaintiff.

When COL Batbie failed to comply with a mandatory, regulatory classification scheme in assigning TCCs to LTC Bond's duty orders, he committed legal error. "[L]egal error includes the military's 'violation of statute, or regulation, or published mandatory procedure, or unauthorized act.' " Dodson v. United States, 988 F.2d 1199, 1204 (Fed.Cir.

1993) (citing *Skinner v. United States*, 219 Ct.Cl. 322, 594 F.2d 824, 830 (1979)). *See also Muse v. United States*, 21 Cl.Ct. 592, 608 (1990) ("The failure of the rating officials to follow their own regulations was legal error."). Further, "the boards for correction of military records may be reviewed for failure to correct plain legal error committed by the military." *Dodson v. United States*, 988 F.2d at 1204.

Because the AFBCMR mistakenly relied on COL Batbie's actions as correct, it committed a material error.

> [M]aterial factual errors and prejudicial injustices which are not corrected rise to the level of legal error in that the refusal to correct them is in derogation of the mandate of the boards' enabling statutes and, where pay is lost and claimed, enable us to review and right the wrong. This is the rule that comports best with the legislative intent to do justice to those injured by the occasional legal mistakes to be expected in the administration of a vast military personnel system which Congress expects to be brought to account by judicial authority when necessary. We think that the foregoing are among the "appropriate circumstances" which Congress envisaged for judicial review in its committee report on the correction board statute. . . .

*Sanders v. United States*, 594 F.2d at 816–17 (citations omitted). In the present case, the error was material, as the basis for the AFBCMR's decision turned on whether LTC Bond's duty had the appropriate TCC. The court has held that it did not. Thus, there is a clear nexus between the Board's error and denial of the plaintiff's request for relief. Accordingly, this court holds that the AFBCMR's decision was arbitrary and capricious and contrary to regulation.

Plaintiff further alleges that his denial of relief by the AFBCMR also was arbitrary and capricious because it was unsupported by substantial evidence. "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jennings v. Merit Sys. Protection Bd.*, 59 F.3d 159, 160 (Fed.Cir.1995). When reviewing a correction board decision using the substantial evidence standard, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). Courts should not reweigh the evidence that was considered, but rather must determine whether the board's conclusion was supported by substantial evidence. *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir. 1983). "Substantial evidence is more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "[C]ourts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Kirwin v. United States*, 23 Cl.Ct. 497, 505 (1991) (citing *Heisig v. United States*, 719 F.2d at 1156).

The administrative record reflects that in considering the plaintiff's application for relief on remand, the AFBCMR reviewed a full record. However, the Board's conclusion is contrary to evidence in the record and not supported by substantial evidence. Moreover, the Board decision appears to have been driven by irrelevant factors. Concerning factors deemed by the court to be irrelevant, the AFBCMR remarks that a reservist, such as LTC Bond, assigned to a reserve unit with no full-time active duty personnel, should not expect to qualify for an active duty retirement. After characterizing such expectations as "unfounded" and "self-serving," the board acknowledges that these factors were "more crucial to our decision" in denying LTC Bond relief. However, the issue before the Board was whether or not LTC Bond had served an ADS tour of duty and, thereby, had entered the sanctuary zone to qualify to remain on active duty to complete for the purposes of receiving an active duty retirement. The apparently emotionally-charged issue for the Board and for plaintiff's commanding officer, COL Batbie, of whether

LTC Bond, as a reservist, should have been able to qualify for active duty retirement should not have been factored into the decision making process.

Concerning the lack of substantial evidence in the record, the AFBCMR acknowledged that "Mr. Bond's orders did not place him in a job with primary training content as a part of his duty." However, the board then qualified its statement, noting that LTC Bond's orders placed him on "special ADT" which "appears to have mandated that he be placed into a job with primary training content a part of his duty." In citing the governing Department of Defense regulation, the AFBCMR acknowledges that "[a]uthorized ADT must provide a primary training content to the recipient." Later the Board states that "[w]hether or not the applicant received the training contemplated by the applicable regulation and the CFR is open to question." It then cites the contradictory evidence in the administrative record [20] and concludes, "[s]ince the evidence indicates that the applicant performed some training during the period in question, albeit not as extensive as the applicable regulation seems to contemplate, we find no basis to conclude that he should have performed this duty as ADS and, therefore, qualified for the sanctuary zone." The AFBCMR offers no explanation for why it weighed circumstantial evidence more favorably than direct evidence.

Instead of focusing its analysis solely on whether LTC Bond had received any training, the AFBCMR should have inquired whether, based on the entire record, LTC Bond received sufficient training to meet the requirements of the governing regulations. Indeed, based on the administrative record, the AFBCMR decision, despite its conclu-

sion, indicates significant doubts regarding its own conclusion regarding LTC Bond, when it wrote, "[w]hether or not the applicant received the training contemplated by the applicable regulation and the CFR is open to question" and, "the evidence indicates that the applicant performed some training during the period in question, albeit not as extensive as the applicable regulation seems to contemplate...." Because of the foregoing, the court holds that the AFBCMR's failure to grant affirmative relief to LTC Bond was arbitrary and capricious, unsupported by substantial evidence, and contrary to law.

## V. The 18 Year Sanctuary Zone

Whether plaintiff entered the sanctuary zone was governed by 10 U.S.C. § 1163(d),[21] which reads as follows:

Under regulations to be prescribed by the Secretary concerned, which shall be as uniform as practicable, a member of a reserve component who is on active duty (other than for training) and is within two years of becoming eligible for retired pay or retainer pay under a purely military retirement system, may not be involuntarily released from that duty before he becomes eligible for that pay, unless his release is approved by the Secretary.

10 U.S.C. § 1163(d) (1988).[22] Thus, in 1992 a reservist with 18 or more years of active duty military service, would have entered the 18 year sanctuary lock-in for a full active duty retirement, if he or she were assigned to active duty other than for training. Once satisfying the requirement for 18 active duty years under 10 U.S.C. § 8914 (enlisted) or § 8911 (officer) (1988), the reservist must be

---

**20.** In favor of ADT, the AFBCMR cites a statement from the Chief Navigator from LTC Bond's unit that "normally" during SIOP duty, the unit does some training and that therefore it can be assumed that LTC Bond participated in some unit training. However, the Chief Navigator concedes that no actual training records for the time in question are available. The Board also cites command discretion in assigning training category codes, and a brief training session LTC Bond was ordered to attend after his duty orders were pulled before being sent home. The latter fact was attributed to a statement by one of LTC Bond's attorneys. Against ADT, the Board cites

direct corroborative evidence from two former officers from LTC Bond's unit who claim no training was conducted during the SIOP duty in question.

**21.** As amended December 30, 1987 by Pub.L. No. 100–224, § 4, 101 Stat. 1538.

**22.** Section 1163 was repealed on October 5, 1994, but section 1163(d) was recodified at 10 U.S.C. § 12686(a) by the same legislation. *See* Pub.L. No. 103–337, § 1662(i)(1), (2), 108 Stat. 2998.

performing active duty other than for training in order to be retained to complete 20 active duty years under 10 U.S.C. § 8911 or § 8914. This "retired pay or retainer pay" under 10 U.S.C. § 8911 or § 8914 is to be distinguished from reserve retirement pay at age 60 under 10 U.S.C. § 1331 (1988).[23]

The facts of this case reflect that LTC Bond, a reservist, had accrued over 18 years of active duty service creditable toward retirement when he received orders for an ADS tour that was misclassified as an ADT tour. Because LTC Bond was actually on active duty, other than for training, when he began the SIOP tour of duty in December 1992, he entered the sanctuary zone. Once LTC Bond began the SIOP duty, he was qualified to request sanctuary, which was improperly denied. Because LTC Bond properly applied to remain on active duty under the provisions of 10 U.S.C. § 1163(d), the Air Force erred in involuntarily releasing him before he became eligible for retirement pay.

### CONCLUSION

The plaintiff has established that determining his duty status is a justiciable issue this court can address. Plaintiff failed to establish that the composition of the remand board rendered its decision arbitrary and capricious due to abuse of discretion; however, plaintiff has established that the AFBCMR's decision was arbitrary and capricious because it was contrary to regulation and was not supported by substantial evidence.

Therefore, based on a careful review of the facts and arguments presented, the court **DENIES** defendant's motions to dismiss and for judgment on the administrative record. The court **DENIES** plaintiff's motion for *de novo* review, but **GRANTS** plaintiff's motion for judgment on the administrative record. The Clerk's Office is directed to enter judgment in accordance with this decision. The court, hereby, **ORDERS** the parties to consult, and to file a joint status report on or before **Wednesday, October 11, 2000,** proposing to the court the proper mechanism for implementation of the court's decision.

**IT IS SO ORDERED.**

---

**23.** Section 1331 was recodified as section 12731 on October 5, 1994 by Pub.L. No. 103–337, § 1662(j)(1), 108 Stat. 2998 (codified at 10 U.S.C. § 12731 (1994 & Supp. IV 1998)).